# CHAMPION FUNDING & FOUNDRY COMPANY, Appellant, v. J. W. HESKETT, Respondent.

**Kansas City Court of Appeals, June 3, 1907.**

1. **EQUITY: Appellate Practice: Deferring to Trial Court.** The trial court properly treated this action as one in equity; and the appellate court though disposed to defer to the trial court in such action where the evidence is conflicting, it may form its own conclusions of fact and apply to them principles of law that should control.

2. **CORPORATIONS: Validity of: Arizona Law.** Whether the plaintiff corporation is duly incorporated according to the provisions of the laws of Arizona, *quaere.*

3. **DECEIT: Elements of: Burden of Proof.** The plaintiff in an action for deceit must show; first, that false representations on material matters were made to him; second, that he believed them to be true; third, that his reliance on them was an act of ordinary prudence; and, fourth, that they influenced his action.

4. **———: Sales: False Representations: Material Fact.** False representations must be not only untrue but be made with the intention knowingly to deceive to the damage of the vendee; and a material fact is one that has bearing on the value of the subject of negotiation, and mere opinions and predictions, however false, will not amount to such facts.

5. **———: ———: ———: Value.** Though representations as to value are usually the mere commendations, yet where the value of the article sold has been tested to the knowledge of the vendor, his representations as to its great value would become not only false, but likewise material.

6. **———: ———: ———: Vendee's Conduct.** Though the representations are false, material and relied on by the vendee, he is still not relieved of the duty to act prudently and investigate.

7. **———: ———: ———: ———: Evidence.** Evidence relating to certain representations as to the value and utility of a certain carburetor is considered and the representations held to be reckless and therefore fraudulent; but the conduct of the vendee shows he was not moved to his prejudice by the representations, but went into an undertaking with eyes open, and with the motive, always to be reprobated of profiting by the loss of others.

7. ——: ——: ——: Pari Delicto: Public Policy. The evidence relating to the plans and purposes of the plaintiff's organization and the motive and conduct of the defendant in a certain transaction is reviewed and such purposes and conduct are held to be *contra bonos mores* and uninforcible in the courts of the land; and it is further held to compel defendant to pay certain notes because he was not deceived and is himself guilty of moral turpitude, would license the plaintiff to go on in its work of contaminating the public because its officers are cunning enough to abstain from lying to their victims while inducing them to walk into the trap laid.

Appeal from Cole Circuit Court.—*Hon. William H. Martin,* Judge.

AFFIRMED.

*W. S. Pope* for appellant.

(1) The judgment of the court is complained of by plaintiff in motions for rehearing and in arrest, and should be reversed, for defendant will not be permitted to retain the fruits of his venture and avoid its burdens. 24 Am. and Eng. Ency., p. 624, et seq; Robinson v. Siple, 129 Mo. 220; Jenkins v. Life Ins. Co., 79 Mo. App. 55; Bank v. Hunt, 76 Mo. 439; Wade v. Ringo, 122 Mo. 322; Fleckenstein v. Inv. Co., 160 Mo. 649; Brown v. Norman, 65 Miss. 369; Johnson v. Cooperly, 33 Ind. 153; Buena Vista F. & V. Co. v. Tuohy, 107 Cal. 243; Stephenson v. Allison, 123 Ala. 447; Stromberg v. Construction Co., 86 Ill. App. 270; Merrill v. Wilson, 66 Mich. 232. (2) Every opportunity was afforded defendant to investigate the business in which he was about to engage before he gave notes for the stock, patent rights and agency contract. He made such investigation. He was convinced that the enterprise would be a profitable one. He went into it, with the others, for the purpose of making money, and because it has not succeeded as rapidly and profitably as he expected, is no reason why he should be relieved, especially as his failure to pay the notes is partly the cause of plaintiff's embarrassment and failure to push the enterprise.

Jones v. Rush, 156 Mo. 364; Wade v. Ringo, 122 Mo. 322; Harrison v. Walden, 89 Mo. App. 164; Chase v. Rusk, 90 Mo. App. 25; Davis v. Insurance Co., 81 Mo. App. 264; Basye v. Jamison, 124 Mo. 551; Black v. Epstein, 93 Mo. App. 459; McMealy v. Baldridge, 106 Mo. App. 11. (3) A representation to vitiate a contract must be in regard to some past or existing fact. A promise is not a representation. Assertions made in regard to what property would produce or its future prospect will not avoid the purchaser's note, given therefor. The representation of an inventor, as to the effect of his mechanical devices and as to improvements over the other devices in that line, do not constitute such fraud as will warrant the setting aside of a contract of sale. Wade v. Ringo, 122 Mo. 322; Bank v. Hunt, 79 Mo. 439; Lewis v. Land Co., 124 Mo. 672; McFarland v. Railroad, 125 Mo. 253; Anderson v. McPike, 86 Mo. 292; Dunn v. White, 63 Mo. 181; Bailey v. Smock, 61 Mo. 313; Wannell v. Ken, 57 Mo. 478; Herman v. Hall, 140 Mo. 270; Jones v. Rush, 156 Mo. 364; Cornwall v. Real Estate Co., 150 Mo. 377; Black v. Epstein, 93 Mo. App. 459; Morris v. McMahan, 75 Mo. App. 494; Davidson v. Hobson, 59 Mo. App. 130; Hotel Co. v. Tiernan, 8 Mo. App. 596; Nauman v. Oberle, 90 Mo. 666; Terry v. Insurance Co., 3 Mo. App. 595. (4) In equity cases the court is not bound by the findings of the trial court, but will review the evidence and render such judgment as good conscience dictates. This is settled law in this State. Hoeller v. Haffner, 155 Mo. 597. (5) The evidence discloses that defendant overestimated his ability to sell to others the same kind of property he had bought; that his judgment was faulty in estimating the ease with which he could reach "easy street;" that he is more grieved in not being able to sell to others than by any fraud practiced upon him by his "Brethren;" all of the promoters, defendant included, were too sanguine as to results, that they expected too much too soon.

*Silver & Brown* for respondent.

(1)   The representations were not statements of opinions but of existing facts, and if falsely made, as the evidence abundantly showed, made out a case of fraudulent misrepresentations which entitled defendant to the relief asked in his answer.   Coulter v. Clark, (Ind.), 66 N. E. 739; Economic Heater v. American Co., 32 Fed. 735; Schofield, etc., Co. v. Schofield, 71 Conn. 17; Henry v. Dennis, 93 Me. 106; Hubbard v. Briggs, 31 N. Y. 518; Barrington v. Ryan, 88 Mo. App. 85; Paquin v. Miller, 163 Mo. 79.   (2)   One who issues a prospectus of a corporation which is intended to influence purchasers in the market as well as subscription for shares, is liable to one who is thereby induced to purchase shares. 1 Page on Contracts, sec. 114, note; Bank v. Phillips, 22 Mo. 85.   Fraud is not merged in a written contract. Gooch v. Connor, 8 Mo. 392; Leiches v. Keeney, 98 Mo. App. 405; Culp Co. v. Powell, 68 Mo. App. 238; Liebke v. Methudy, 14 Mo. App. 66.   (3)   A false representation need not be the sole cause of the contract in order to authorize its rescission; it is sufficient if such representation was one of the inducements for making it. Burnham-Hanna Co. v. Ellmore, 66 Mo. App. 617; Saunders v. McClintock, 46 Mo. App. 216; Wannell v. Kene, 57 Mo. 478.   (4)   The declarations and statements of Knight are properly treated as those of the plaintiff, his principal.   McLachlin v. Barker, 64 Mo. App. 526; Costigan v. Transportation Co., 38 Mo. App. 219; Dickinson v. Kempinking, 90 Mo. 253; Bishop v. Sealm, 87 Mo. App. 256; Culver v. Smith, 82 Mo. App. 397; Lovelace v. Suter, 93 Mo. App. 440.   (5)   The defendant as plaintiff, under the evidence in this case, showing the false and misleading statements made by Knight, its president and in its literature, could have successfully maintained an original suit for the cancellation of the notes sued on by plaintiff.   Beland v. Brewing Association, 167 Mo. 593; Paquin v. Millikin, 163

Mo. 79; Barrington v. Ryan, 88 Mo. App. 85; 2 Story's Equity Jurisprudence (13 Ed.), secs. 694-700; More v. More, 133 Cal. 489; R. S. 1899 secs. 604-5; Joyce v. Growney, 154 Mo. 253.

JOHNSON, J.—Action to recover judgment on three promissory notes executed by defendant. In the answer, defendant admitted the execution and delivery of the notes, but alleges they were procured by fraud and prays for their cancellation and for other equitable relief, the nature of which will be disclosed in the statement of the facts of the case. The learned trial judge, sitting as a chancellor, heard the evidence, found the issues in favor of defendant and entered judgment accordingly, from which plaintiff appealed. The facts pertinent to the issues raised by the pleadings are somewhat involved, but must be fully stated in order to discuss intelligently the questions of law presented.

In February, 1903, Archie H. Rife, of Dallas City, Illinois, the inventor of a certain type of carburetor obtained United States letters patent covering his invention and in July of the same year duly assigned the same to the Champion Funding Company, a corporation organized under the laws of Iowa for the purpose of selling territorial rights to vend the device. The stockholders contributed five thousand dollars in cash to the capital stock and the company sold some county rights realizing proceeds that brought its net assets, exclusive of the value of the patent, to about eleven thousand dollars. The sales were made with the agreement on the part of the company that when it should become possessed of funds to the amount of fifty thousand dollars, it would erect a suitable factory and proceed to manufacture the device to supply the demands of those who had purchased county rights. Without waiting for the consummation of this purpose and with affairs in the

condition stated, its five stockholders, who owned all of the capital stock, concluded to form a new corporation to conduct the business on a different plan from that being pursued.

Accordingly on the fourteenth day of January, 1904, these stockholders succeeded in incorporating the present company under the laws of Arizona with an authorized capital stock of six hundred and fifty thousand dollars, which was distributed as follows: Three hundred thousand dollars was given to the five stockholders of the old company in consideration of the assignment and transfer to the new company of the "patents and improvements, patent rights, unsold territory, factory site, office equipment, business, copyrights and moneys in bank" owned by the old company; fifty thousand dollars was set aside for the re-purchase by the new company of certain territorial rights, which had been sold; and the remaining three-hundred thousand dollars was placed in the treasury for the purpose of being sold to raise funds for the uses of the corporation. The three hundred thousand dollars of stock given in purchase of the assets of the old company was divided in this manner: The assets transferred by the old to the new company (exclusive of the patent) which, as stated, amounted to eleven thousand dollars, were deemed to have paid for one hundred and fifty thousand dollars of this stock, and each of the five stockholders in the old company received thirty thousand dollars as his share thereof, for which he was accounted to have paid the sum of two thousand and two hundred dollars. The remaining one hundred and fifty thousand dollars of this stock was divided into five portions of thirty thousand dollars each and it was proposed to sell each portion to some person whom the five original stockholders desired to have associated with them in the control of the corporation at the price of two thousand and two hundred dollars cash for each portion, so that the corporation

would be controlled by a board of ten members, each of whom would own thirty thousand dollars of stock, for which he would have paid two thousand and two hundred dollars. The proceeds to be derived from sales of such portions were to go into the treasury of the company, so that, in effect, the members of the old concern received one hundred and fifty thousand dollars in stock of the new corporation for all of the assets transferred, including the patent, and the remainder of the stock was to be sold for the benefit of the corporation.

A novel plan was adopted for the sale of the treasury stock, which as stated, amounted to three hundred thousand dollars and from which the directors expected to derive the means to further the enterprise. This stock was divided into portions of five shares each (the par value of a share being one hundred dollars). Each stock purchaser was required to buy a certificate for one of these portions at the price of five hundred dollars, the par value of the shares, and in addition was required to buy the right to vend the carburetor in two counties, for which he must pay the sum of one thousand dollars. His purchase of stock and county rights entitled him to receive appointment as an agent of the company for the sale of stock and county rights to others and for each sale he might make in his own or any unsold territory he was to receive a commission of five hundred dollars, and for each one made in territory sold to another he was to have a commission of four hundred dollars, and one hundred dollars was to be paid to the owner of the territory. All sales were to be made on exactly the same terms; that is, each purchaser was to buy five shares of stock, two county rights and an agency for which he was to pay the gross sum of one thousand and five hundred dollars. Agents were not expected to close sales. They were provided by the company with pamphlets, circulars and other printed "literature" extolling in superlative language the merits of the carburetor and

with "cards of introduction" to the president of the company. Armed with these, they were to endeavor to persuade those who were worth one thousand and five hundred dollars, or more, to. go to the principal office of the company at Burlington, Iowa, and investigate for themselves and, as an inducement, the company, on being advised by an agent of the contemplated visit of a prospective purchaser of the requisite qualification, sent the latter money to pay his railroad fare and agreed. to defray his hotel bill while in Burlington. The introduction card presented by the visitor, which had to be signed by an agent to obtain an audience for its bearer, determined which agent was entitled to receive the commission should a sale be effected. The value placed upon county rights to vend the carburetor was uniform. Any two counties in the United States could be bought for one thousand dollars, and the purchaser who bought the right in two of the most populous and wealthy counties in the country, paid no more therefor than must be paid for the right in two desert counties. It was to be a case of "First come, first served," and each purchaser was to be given the choice of unsold counties.

Nor did the plans of the promoters leave out of consideration provision for the manufacture and distribution of carburetors. The citizens of. Dallas City, Illinois, a town across the river from Burlington, offered a bonus of three thousand dollars for the location of the company's factory in that place. The offer was accepted and at the time defendant became interested the foundation of a somewhat pretentious factory building had been laid. It was the avowed purpose of the company to complete the building, equip it with the necessary machinery, and supply the demand for carburetors that might result from the disposition of county rights. Until that could be done, the practical utility of the invention was to a great extent conjectural. A few carburetors had been made and installed, one to an ordinary

gasoline stove in plaintiff's office, but these by no means demonstrated the value of the invention except, perhaps, for one use and not clearly for that.    A carburetor is a device for generating gas for fuel and lighting from a mixture of gasoline gas with air.   It was claimed that this invention would revolutionize the art to the extent of substituting its product for all others for use in lighting and heating and in the generating of power. It readily occurs to anyone that the attachment of the smallest of carburetors to a gasoline cooking-stove hardly could be expected to demonstrate the utility of the invention to provide the power for heavy machinery, but the company appears to have thought the thing of first importance was to raise all the money it could by the sale of stock and county rights, leaving to the future the making of such practical tests as would determine the real  scope of usefulness, if any, possessed by the invention.

Thus constituted and circumstanced, the company opened commodious and well-appointed offices in Burlington and began business by bestowing all its activities in the sale of stock and county rights.  G. W. Knight, a minister of the Christian church, was its president and its other officers were identified with that denomination.

Defendant lived at Jefferson City, had been a merchant and was an active member of the Christian church. A minister of that church named Corwin approached him a short time after the incorporation of the plaintiff company, solicited him to go to Burlington to investigate the project with a view to making an investment and referred him to Rev. A. N. Lindsey, who was then conducting services at Jefferson City in the church of which defendant was a member.   Defendant says Rev. Lindsey told him "that it was a good thing—that he considered the invention one of the greatest things that had ever been invented and that he really felt that it

was a God-send to our church that this invention had been given into the hands of our people."

Rev. Lindsey gave defendant a "card of introduction" signed by himself and, with this, defendant went to Burlington to investigate for himself. Arriving at plaintiff's offices, he presented his card and was ushered into the presence of the president.    Agreeable conversation ensued relative to church matters, after which the business of the interview was entered into.    Defendant says he was told "that the invention was one of the greatest things that had ever been invented in the use of gasoline; that it would revolutionize the gasoline business so far as light, heat and power were concerned; that it was an article that would be used in every household, factory and mill; that it was the intention to manufacture it on a large scale and sell in the United States and later go to Canada and Europe with it;  . . .  that it would be a great saving of expense, possibly about half in fuel and power, at least twenty-five per cent saving in light over other systems on the market;  . . .  that the invention was very valuable and they expected to have a factory in operation by the first of July following (this was in January), that they had the foundation laid and, as soon as the weather opened, would go to work on the factory building;  . . .  that they had a stove with this invention attached to it—they lit the stove up and extinguished it to show how it worked; and claimed this stove would ignite instantaneously and extinguish instantaneously, but at that time it didn't work as it should, because somebody had tampered with it."

Mr. Knight explained in detail the facts relating to the organization of the company, the distribution of its capital stock and its plan of operation.  He neither withheld the disclosure of material facts nor misrepresented them, so that defendant knew before he decided to invest that no real practical tests of the invention had been made; that the wonderful results claimed for it

were based on nothing, but conclusions drawn from experimental tests; and that on this highly speculative foundation a corporation had been created. He knew that three hundred thousand dollars of its capital stock had been given for eleven thousand dollars of tangible assets and a patent, and that the remainder of the stock had not been subscribed, but was in the treasury to be sold. Further, he knew that the president of the company, on whose statements he claims to have relied, was a professional man inexperienced in the art of generating gas from gasoline for practical uses and that the other officers of the company with the exception of the inventor of the carburetor were equally inexperienced in that art. Defendant did not invest on his first visit to Burlington, but, equipped with a full supply of the company's so-called "literature" returned home and consulted further with the Rev. Lindsey and also talked over the project with a Mr. Salisch, a friend of his, who had become interested therein. In a few days, accompanied by Mr. Salisch, he returned to Burlington. The whole subject was gone over a second time; the visitors were offered the opportunity to inspect the books of the company and did make some examination of them though not a very careful or thorough one. A sale was made to defendant by the terms of which he received a certificate for five shares of the capital stock of the company; a deed giving him the exclusive right to vend the carburetor in Wyandotte county, Kansas, and Cass county, Nebraska, and an appointment in writing to act as agent of the company in procuring others to invest on like terms. In return, defendant executed and delivered to plaintiff his promissory notes for one thousand and five hundred dollars. He knew at the time that five hundred dollars of this consideration would go to Lindsey and Corwin as agent's commission, of which the former would receive four hundred dollars and had made an agreement with him to receive half of his share thereof. Mr. Salisch, who

Funding & Foundry Co. v. Heskett.

was treated as the customer of defendant, also invested, paying five hundred dollars in cash and executing his promissory note for the remaining one thousand dollars. Out of the cash payment plaintiff paid defendant one hundred and thirty-three dollars and thirty-five cents on account of agent's commission.

The representations which defendant claims were false and fraudulent and on account of which he seeks the equitable rescission of his contract and the cancellation of his notes are thus stated in his brief:

"Plaintiff represented that its carburetors were the most perfect device theretofore discovered or in use from the standpoint of safety, economy, durability, and efficiency for cooking, heating, lighting, or other like purposes, and that the patents were very valuable; that plaintiff's business in connection therewith was founded on business principles, was conservatively managed, was prosperous and making good money, that said business was a safe and sound business proposition." Defendant now claims that he believed in these representations and was induced by them to make the purchase. We have noted the facts which make clear the extent of his reliance on the assurance that the business was being conservatively managed, was conducted on sound business principles and was making money, and now will refer to other facts that throw light on the influence exerted on defendant's conduct by the statements relative to the value of the invention and the results it would surely achieve.

The letters written by defendant to plaintiff during the first three months of their business relation exhibit quite clearly the influence that controlled him. Nowhere does he betray any thought of attempting to establish a demand for carburetors in the territory he purchased. He visited neither Wyandotte county, Kansas, nor Cass county, Nebraska, but worked in and around Jefferson City endeavoring to induce people to go to Burlington

to buy stock and county rights on the same terms he had purchased. He emitted numerous "cards of introduction," but his efforts were unavailing and, aside from Salisch, he did not procure a single sale. A short time after he became identified with the company at its request he made another visit to Burlington for the purpose of receiving what is expressively termed in the evidence "a ground floor proposition." The president told him that there were three vacancies on the board of ten "inside" members and that defendant had been deemed worthy of the honor of a place with them. Therefore, if he would pay two thousand two hundred dollars in cash, he could have a certificate for thirty thousand dollars of the stock given to the old company in the purchase of its assets. Defendant was much interested, but took the offer under consideration and after returning home wrote plaintiff this letter:

"Jefferson City, Mo., Feb. 22, 1904.
"Mess. Champion Funding and Foundry Co.,
    Burlington, Iowa.

"Dear Bro. Knight:—"I reached home via. St. Louis yesterday at 12:40 and have been thinking our matter over with my wife considering it. This is certainly a very interesting proposition and worthy our most serious consideration. If expectations are half realized, this deal would put us all on easy street certain, a position we all seek. However much we desire this world's goods though, I have always gone on the theory of giving value received for what we get. And while I assure you I appreciate your good opinion of me and the offer you are making me, I want to know beyond a doubt that we will not fall down on our promises to the public, that this invention will actually accomplish the claims made for it. We all should be absolutely certain of the results. Theory, you know, often falls short of practice and I feel that a more practical demonstra-

tion of this invention is needed to show up its claims for light and power especially.

"While I am in earnest and anxious to get in on the ground floor of this proposition, I would like to see the whole matter demonstrated before I assume the responsibilities of this close relationship in the company. Now, I understood while up there Saturday that you would have everything in shape this week in the new room to show the working of the engine and light as well as the stove and this being the case I wish to either come up again and see the demonstration or get your report of it before I close our deal. I trust this is not asking too much and hope to hear from you soon." The effort to bestow on defendant this, the highest mark of favor in the gift of the company, eventually failed, not on account of defendant's unwillingness to receive it, but because plaintiff demanded cash and defendant, short of money, insisted on paying in real estate.

The first chill cast on the enthusiasm of defendant occurred when plaintiff placed one of his notes in bank for collection at about the time of its maturity. Defendant complained of this and asked for an extension of time, which was granted. He then became impressed with the idea very generally expressed by those whom he solicited to invest, that the invention possessed no particular excellence and that he was the dupe of a swindling device. He employed a lawyer, who went to Burlington in his behalf and demanded a return of his notes. This being refused, the present suit was brought when all of the notes had matured. In addition to the cancellation of the notes, defendant also prays in his answer for the equitable rescission of the several contracts made between him and plaintiff.

The issues concerning the real merit of the invention and of the efforts made by plaintiff to establish and conduct the business of its manufacture and distribution

125 App—34

for practical use were sharply contested at the trial, but in the view we entertain the former is of slight importance, and, as to the latter, suffice it to say that plaintiff completed its factory building at a cost of some nine thousand dollars, and at the time of the trial, was manufacturing carburetors on a very small scale. A number of these had been installed in and around Burlington, mostly in private residences and were in successful operation. The aggregate amount realized from all of the instruments sold did not exceed four thousand dollars. It appears there are many different types of carburetors on the market and the only superiority of this one over others is based on the claim that it can be instantly lighted or extinguished.

The learned trial judge properly treated the action as one in equity. So regarded, the facts are before us for review and while we are disposed even in an equity case to defer to the judgment of the trial court in matters relating to the weight to be given to conflicting evidence, we will form our own conclusions of fact from the evidence before us in the record and apply to them the principles of law that should control.

The validity of plaintiff's corporate existence is not attacked either in the pleadings or briefs of counsel for defendant and, therefore, we will assume for the purposes of this case that formally, at least, it was incorporated in accordance with the provisions of the laws of Arizona. We start out on this ground, not as the result of a judicial pronouncement that this artificial entity was in fact and in law legally created, but solely because the parties themselves have tried the case on this hypothesis.

Defendant, under the issues tendered by him, cannot succeed in his attempt to defeat a recovery upon the notes he admits he executed and delivered without showing that he was drawn into the transaction by the false and fraudulent representations of plaintiff. He must

show a state of facts from which these conclusions follow: *first,* that false representations of material facts were made to him; *second,* that he believed them to be true; *third,* that his reliance on them was an act of ordinary prudence; and, *fourth,* that they influenced his action. All of these elements must exist to support a final conclusion that the transaction was the result of artifice and fraud practiced on him by the vendor. [Wannall v. Kem, 57 Mo. 478].

In ascertaining whether a representation made was false and related to material facts, these rules should be followed: Not only must it have been untrue when made, but it must be found to have been uttered by the vendor either with the intent to knowingly deceive the vendee to his damage or under circumstances that show it was recklessly made. "Deception accomplished by false statements is not excused by a groundless belief in their truth on the part of the man who makes them." [71 Conn. 1.] Where the statements are shown to have been palpably false, the vendor will not be permitted to shield himself by saying that he believed them to be true.

A material fact necessarily is one that has some bearing on the value of the subject of the negotiation. As a general rule, the opinions and predictions expressed by the vendor that are intended to enhance the value of the property in the eyes of the prospective purchaser are not facts and though false and known by the vendor to be false, their utterance is not fraudulent in law, immoral though it may be. Where the vendee knows the facts or may know them by the exercise of ordinary prudence, he must form his own opinions and act on his own judgment. [McFarland v. Railway, 125 Mo. 253; Bank v. Hunt, 76 Mo. 439; Anderson v. McPike, 86 Mo. 293; Cornwall v. Real Estate Co., 150 Mo. 377].

But there may be circumstances under which the statement of what on its face appears to be an opinion

amounts in law to the assertion of a fact. To illustrate from the present case. The plaintiff orally and in its printed prospectus asserted that the invention was very valuable. Now, statements of this character, as we have said, are classed as expressions of opinion, but, had it developed that when the statements were uttered to the defendant the invention had been thoroughly tested by practical use and found to be worthless, plaintiff knowing this fact and knowing further that defendant was in no position to ascertain it by the exercise of ordinary diligence, would not only be uttering a falsehood intentionally in saying that it was very valuable but clearly would be asserting a fact, since it is self-evident that the value of the invention would depend on its practical utility. Therefore, to say that it possessed great value, in effect, would be to say that it was a practical success. Where the vendor knows the vendee is so situated that his opportunity to learn the actual facts from which an opinion may be formed does not place him on even ground with the vendor, the expression of an opinion as to value becomes the statement of a material fact, when the vendor knows the vendee is compelled to rely on the truth of his statement, and this knowledge makes his falsehood culpable in law. The freedom the law accords the individual to praise and puff the wares he would sell and to make the best bargain he may, does not obtain where his position with respect to means of knowledge is clearly superior to that of the prospective purchaser. [Jones v. Rush, 156 Mo. l. c. 374; Chase v. Rusk, 90 Mo. App. 25; Coulter v. Clark, 160 Ind. 311; Heater Co. v. Heater Co., 32 Fed. Rep. 735.]

Where the representations have been found to be false and fraudulent, to relate to a material fact and to have been relied on by the vendee to his damage, the next question, and one often difficult of solution, relates to the conduct of the vendee. Courts will not make contracts for people. They must make their own trades and con-

tracts. Where a vendee by neglect and indifference to his own interest permits himself to be overreached, the law affords him no redress, because his own conduct is blameworthy. If he has the opportunity, he must investigate; if the article is before him and its defects are patent, he may not rely on the statement of the vendor that the article is sound, but must look for himself. If he can read, he must read the contract of sale before its execution, and may not take the vendor's word as to its contents. In short, the vendee must make reasonable use of opportunity and his failure to do this leaves him remediless, no matter what the conduct of the vendor may be. A rule less strict than this would emasculate the doctrine of *caveat emptor,* destroy the binding force of private contracts and invest the courts with a paternal supervision over the business affairs of society that would be intolerable because it would be an unwarrantable invasion of individual liberty. It is only in a case where the vendee has done all for his own protection that he should have done in the exercise of reasonable care and has been injured by the fraudulent practices of the vendor that the law will intervene to protect him. [Wade v. Ringo, 122 Mo. 322; Lewis v. Land Co., 124 Mo. 672; Davis v. Insurance Co., 81 Mo. App. 264.]

With these principles in mind, the next subject for consideration is their application to the facts on which defendant relies. At the outset, we think it is proper to say we think that when the plaintiff corporation was launched, its promoters believed the invention possessed some merit, and that the few practical tests that had been made at the time of trial tended to verify this belief. But at no time has there been any ground to justify a reasonable man, actuated by an honest motive, in proclaiming as a fact that this invention, as compared with other carburetors on the market, was so superior that it would supersede all others in use and, on account of its economy and efficiency, dominate the entire field

in the furnishing of cheap and excellent light, fuel and power. The representations so confidently and positively made by plaintiff, that it would accomplish this marvel, in the absence of any real, practical demonstration, were entirely devoid of a reasonable foundation of fact and were recklessly, and, therefore, fraudulently uttered.

And, further, it is perfectly plain that belief in the utility of the device played no material part in inducing the incorporation of the plaintiff company. The scheme of its formation and the operations conducted after its creation all demonstrate that the installation of the device into general use, while contemplated as a possibility for which some sort of provision had to be made, was not one of the purposes of the incorporators. The intrinsic merit, if any, of the invention was a thing to be exaggerated and heralded in aid of the real purpose of the incorporators, which was to lure people to the office at Burlington where, by an appeal to their cupidity, the stock of the company and county rights to vend the article could be sold at fictitious values.

Each shareholder outside of the ten who were "on the ground floor" was required to buy five shares of the treasury stock at par and "two counties" at five hundred dollars each, which meant that the sale of all of three hundred thousand dollars of stock in the treasury would distribute it among six hundred "investors," who would own, in the aggregate, county rights in twelve hundred counties for which they would have paid a total of nine hundred thousand dollars. Of this sum, three hundred thousand dollars would have been paid in agent's commissions, leaving six hundred thousand dollars in the treasury of the company, less operating expenses. There would then be outstanding and in force capital stock amounting to six hundred thousand dollars, of which the favored ten would own one-half as the reward for nothing but their ingenuity in promoting this novel scheme

for getting something for nothing. All they thought was needed to avoid the appearance of gross fraud and to attract the attention of "investors" was something on which to build plausible representations, and a patent gate, collar button, churn, or anything else for which great things could be claimed, would have served the purpose, perhaps, as well as a carburetor.

The bait to the investor was the agency contract. None but those who invested was to be permitted to act as agent. The agent had but little to do. All that was necessary was for him to go among his acquaintances, repeat the jargon about the invention he had learned at Burlington, hand them "literature," represent that he had invested and persuade them to make a trip to Burlington for investigation at the expense of the company. Each sale he induced brought him a commission of five hundred dollars; therefore, three sales would bring him one thousand and five hundred dollars which would reimburse his outlay so that he would own five hundred dollars in stock and two county rights, free of charge. After that, every commission earned was clear profit. Plaintiff took great pains to show to investigators how much agents had received in such profits. The whole thing was a plan which, by appealing to greed, was designed to seduce people into a purely speculative undertaking. All of the facts lead to this conclusion: Compelling all to invest on the same terms; the invariable accompaniment of an agency with a sale; the placing of the same value on county rights regardless of the population and wealth of the counties; the concentration of all real activity in the procurement of investors; the feeble and dilatory efforts made to demonstrate the utility of the invention and to prepare for its manufacture on a scale in keeping with the magnitude of the company and its avowed purposes; the very inauguration of a concern of such vast pretensions without first thoroughly proving the usefulness of the invention, are

all facts which show that the industrial feature of the enterprise was a negligible quantity in the purposes of the promoters.

But was defendant deceived by the representations made to him?

Before he invested, he knew that the real value of the carburetor had not been demonstrated and, therefore, knew the assertion that it was a valuable invention was, at best, nothing more than opinion based on theory and conjecture.  His letter, we have quoted, discloses the impression made on his mind by these representations, and it is the shallowest of pretenses for him now to claim that he was deceived by them.  He argues that he could indulge in the presumption that the officers of the company had knowledge of the things they professed to know concerning the invention, but presumptions always yield to actual facts and knowing, as he did, that the officers were but talking in the air, no presumption gave him the right to rely on such unsubstantial vaporings.  The same may be said with reference to the representations that the business was organized and conducted on a sound and conservative basis.  Defendant knew the facts themselves and they proclaimed the nature of the organization and of its operations.  In fine, he knew exactly what he was buying and received from plaintiff the very thing he intended to buy.  He went into this questionable undertaking with his eyes open and with the motive, always to be reprobated, of profiting by the loss of others.  That this is true is abundantly supported by his own actions and utterances.  He did not visit the territory he purchased and talked to no one about buying a carburetor, but was industrious in his efforts to procure other investors.  In his letters to plaintiff, he talked of no other subject.  His every action shows he was imbued with the idea that his money was to be made out of investors rather than from a bona fide effort to sell carburetors in the territory he had pur-

chased.    It was not until he became interested in the
"ground floor proposition," that we find him even think-
ing of the advisability of having the practical utility of
the invention tested and this was some time after he
had executed and delivered his notes and at a time when
his efforts to procure investors had resulted in failure.

What has been said necessitates the conclusion that
defendant has failed in his defense based on the charge
that he was deceived to his damage by false and fraud-
ulent representations, and as this is the only defense
presented by the pleadings, the judgment should be re-
versed unless we find that relief should be granted de-
fendant on a ground not pleaded, but which, with great
earnestness, he now urges on our consideration.    The
principle invoked is thus stated in 2 Greenleaf on Evi-
dence, section 111: . "If it (the contract) appears to
have for its object anything forbidden by the laws of
God, or contrary to good morals; or, if it appears to be
a contract to do or omit, or to be in consideration of the
doing or omission of any act, where such doing or omis-
sion is punishable by criminal process; or if it appears
to be contrary to sound public policy, or if it appears to
be in contravention of the provisions of any statute; in
any of these cases, plaintiff cannot recover, but upon his
own showing may be nonsuited.    For the law never
lends its aid to carry such agreements into effect, but
leaves the parties as it finds them *in pari delicto*."

Applying this principle, defendant contends that as
the admitted facts in evidence show that plaintiff and
defendant were in equal wrong in an attempt to per-
petrate a fraudulent and immoral scheme against the
rights of others, the law will refuse to enforce the un-
lawful agreement and will leave the parties where it finds
them.    Should we find that the admitted facts in evi-
dence disclose that the notes in suit were executed in fur-
therance of a scheme to defraud which should be de-
nounced as *contra bonos mores* and that the parties are

of equal guilt, we do not think the position of plaintiff is aided at all by the fact that in suing at law on negotiable promissory notes, it is not compelled to bring in the' illegal transaction in order to make out a prima facie case.    Directly in point is the case of Parsons v. Randolph, 21 Mo. App. 353, where it was argued that if a plaintiff "can show a complete cause of action without being compelled to resort to an illegal transaction, he may recover, notwithstanding the cause of action may have had its origin remotely in a transaction forbidden by sound policy and morals."    But we held the rule that plaintiff may recover if he can show a complete cause of action without being obliged to prove his own illegal act, applies only to that class of cases where the cause of action is not essentially based upon something which is illegal, but upon some supervening right not depending mediately upon the illegal transaction for its support, and we followed the principle stated in Hall v. Corcoran, 107 Mass. 253, that "whether the form of action is in contract or in tort, the test in such case is whether, when all the facts are disclosed, the action appears to be founded in a violation of law in which the plaintiff has taken part."    And, further, we held that where the cause of action sued on by plaintiff is essentially founded on something which he, himself, admits is illegal, it is immaterial how the facts are brought to the attention of the court.    Strongly illustrative of the morality and common sense of this principle is the example given by Judge PHILIPS in the opinion: "If this position be correct (referring to the contention of counsel for plaintiff), A could sue and recover judgment against B on a note given him by B in consideration that A would murder some enemy of B.    For, just as the plaintiff did in this case, all A would have to do at the trial to make out a prima facie case, would be to read his note in evidence and rest.    It being a promissory note

for value expressed on its face, by the rule of law it imports a valuable consideration."

Manifestly, justice and good conscience would be mocked should a court of equity permit a mere rule of pleading to prevent its enforcement of principles established for the conservation and protection of public morals. An agreement to do an unlawful act cannot be supported at law or in equity and no right of action can spring out of it. It is absolutely void and whenever, and by whatever means, it appears beyond question to the court that the contract on which the cause asserted is based, is of such character, the court will repudiate it as a thing utterly void.

Nor are we, as a court of equity, precluded from rejecting the demand of plaintiff founded on the notes in controversy by the fact that defendant has failed to offer to return to plaintiff what he received as a consideration for them. The door of the court will be shut in plaintiff's face, regardless of what defendant has done or failed to do, should we find that the parties have contracted to do a thing against public morals. The rule that a party to be entitled to a rescission of a contract on the ground of fraud must first offer to return the fruits of the contract received by him, has no application to cases of the character under consideration. In such cases, courts care nothing for the guilty parties. They have no equities or rights, and the only decree that should be made is one that will best promote the interests of society. If we find the notes in controversy should be cancelled, it will not be out of any solicitude for defendant, but because it will be the only means available by which a fraudulent attempt on the rights of others may be frustrated.

That the notes were given as a part of a scheme to defraud the public is clear from what we have already said. The whole contrivance was nothing more or less than a thinly disguised device to sell stock to the general

public on a plan that would certainly result in complete loss to the last investors. Courts always will pierce through such disguises and will refuse to be hoodwinked by them. A fraudulent scheme which has for its object the seduction of people from the paths of common honesty is a public nuisance, and to suffer it to exist, or in any way to aid in the accomplishment of its purposes would be against the public good. "It is the settled public policy of the United States that its courts shall sustain no action whether in tort or on contract which arises out of the moral turpitude of the plaintiff or from his violation of a general law of public policy, because the maintenance of such actions promotes violations of the moral law and of the civil law by inspiring the belief that one may safely violate both, since if he loses the courts will make him whole." [Stewart v. Wright, 47 Fed. 321.]

Should we hold that defendant must pay these notes because he was not deceived and is himself guilty of moral turpitude, we would be compelled further to say that plaintiff is licensed by law to go on in its work of contaminating people because, forsooth, its officers are cunning enough to abstain from lying to the victims, while inducing them to walk into the trap laid. For a court to promulgate a doctrine so monstrous would be no less immoral and against the policy of good government than is the conduct of plaintiff.

It legally follows from the views expressed that the learned trial judge committed no error in denying plaintiff a judgment on the notes and in decreeing their cancellation. Accordingly the judgment is affirmed. All concur.