MORBROSE INVESTMENT COMPANY, a Corporation, Respondent, v. ROBERT J. FLICK, Appellant.

Kansas City Court of Appeals, March 1, 1915.

1. **BILLS AND NOTES: Fraud and Deceit: Vendor and Vendee.** The plaintiff seeks to recover the balance due ($350) on a promissory note, given by defendant to E. P. Moriarity & Company, on the purchase price of a motor car. The latter sold and delivered the note to the plaintiff, a corporation, whose capital stock was owned principally by E. P. and J. F. Moriarity. The defendant admitted the execution and delivery of the note, but asserted that he was fraudulently deceived in the sale of the motor car. The court refused to submit the issues of fraudulent representations to the jury, and peremptorily instructed it to return a verdict for plaintiff. *Held,* that the court erred in not submitting the issues of fraud and deceit to the jury, since there was substantial evidence that representations regarding the rebuilding of the car and as to other matters were false and fraudulent; that such representations were relied upon by defendant and that defendant was entitled to recoup the cost to him of the repairs of concealed defects, which existed at the time of the sale.

2. ————: ————: ————. When one discovers a fraud he may elect not to rescind the contract, but to avail himself of the rule which accords to the vendee, who has been induced to enter into a contract of sale by the fraud and deceit of vendor, the right to stand on the contract and recover damages for the tort committed by the vendor in inducing the sale by fraud.

3. ————: ————: ————. When one wishes to diminish the stipulated price of an article purchased by the amount of damages he sustained in consequence of fraud in its sale, it devolves on him to show, first, that false representations of material facts were made to him; second, that he believed them to be true; third, that his reliance on them was an act of ordinary prudence; and, fourth, that they influenced his action.

Appeal from Jackson Circuit Court.—*Hon. Thos. J. Seehorn,* Judge.

REVERSED AND REMANDED.

*McCune, Harding, Brown & Murphy* and *R. B. Caldwell* for appellant.

(1) The court erred in refusing to permit defendant to show the actual value of the car when he bought it, and this was necessary in order to fully show his damages. Kendrick v. Ryus, 225 Mo. 158; Noel v. Hughes, 152 Mo. App. 195; Belcher v. Costello, 122 Mass. 189; 20 Cyc. 54. (2) Defendant is entitled to recoup in this case. Langdon v. Markel, 48 Mo. 357; Nelson v. Johnson, 25 Mo. 432; Wagner v. Dette, 2 Mo. App. 260; 34 Cyc. 745; State v. McHale, 16 Mo. App. 178. (3) Plaintiff's reply did not put in issue the allegations in defendant's answer and on the record they stand admitted. Sundmacher v. Lloyd, 135 Mo. App. 517; Dezell v. Fidelity & Casualty Co., 177 Mo. 279; Betz v. Telephone Co., 121 Mo. App. 476.

*Lathrop, Morrow, Fox & Moore* for respondent.

(1) It was the duty as well as the prerogative of the court to direct a verdict for respondent. Any other verdict could not have been allowed to stand. Hite v. Street Ry. Co., 130 Mo. 132; May v. Crawford, 150 Mo. 504; Asphalt Co. v. Transit Co., 102 Mo. App. 469; Knapp v. Handley, 108 Mo. App. 353. (2) Courts cannot make contracts for parties. They must read them before they execute the contract. They must use their own senses for their protection. Champion Funding Co. v. Heskett, 125 Mo. App. 516; Carroll v. United Railways Co., 157 Mo. App. 247; Shearer v. Hill, 125 Mo. App. 375; Bank v. Dowler, 167 Mo. App. 373; Hines v. Royce, 127 Mo. App. 718.

187MoApp34

JOHNSON, J.—Plaintiff sued defendant March 13, 1913, to recover a remainder of $350 due on a promissory note for $850 executed and delivered by defendant to plaintiff December 23, 1911, and payable in monthly installments, the last of which matured October 1, 1912. The note was given in part payment of the purchase price of a second-hand Packard Automobile defendant purchased of E. P. Moriarty & Company, who were sales agents in Kansas City of the manufacturers of such cars. The answer admits the execution and delivery of the note and does not plead payment but does plead fraud and deceit of plaintiff in the sale of the car which damaged defendant in an amount exceeding the remainder due on the note and prays for the recoupment of such damages.

The reply is a general denial. At the close of the evidence the jury, in obedience to a peremptory instruction, returned a verdict for plaintiff for the full amount of its demand and against defendant on his "counterclaim or claim for recoupment." Motion for a new trial and in arrest of judgment were filed by defendant and overruled by the court and defendant appealed.

The evidence relating to the issue of fraud and deceit discloses the following facts. E. P. and J. F. Moriarty, who composed the firm of E. P. Moriarty & Company, are brothers and were the principal owners of the stock of the Morbrose Investment Company which appears to have been incorporated at their instance for the purpose of handling their investments. As a rule when they extended credit to a purchaser of an automobile, they sold and assigned their claim against him to the corporation of which, it may be added, they were the chief executive officers. In the present instance defendant purchased a used Packard car from the partnership for $3100, paying $2250 in cash and giving his note to the corporation for $850. Asked to state the reason for having the note made

payable to the Investment Company, E. P. Moriarty, who closed the sale to defendant, testified, 'because E. P. Moriarty & Company didn't want to carry any notes, but the Morbrose Investment Company here loaned them money but kept the note, it was sold to the Morborse Investment Company by the E. P. Moriarty Company."

A solicitor for the partnership began the negotiations which ended in the sale of the car and, according to the testimony of defendant, made the fraudulent representations on which the claim for recoupment is founded. The partnership had taken the car as a partial payment of the purchase price of a new car sold to another customer. The solicitor called on defendant and urged him to buy the car at the price of $3100. In reply to defendant's effort to obtain a better price the solictor—so defendant states—represented, in substance, that the manufacturer fixed the prices at which the sales agents were allowed to sell second-hand cars and would not allow them to be sold until they had been rebuilt at shops maintained by the manufacturer in Kansas City and restored practically to the same condition as when new; that the contract of sale would carry the manufacturer's guaranty given with new cars; that the price fixed by the manufacturer on this car was $3100, from which the sales agents could not deviate, and that the car had been rebuilt and was in as good condition as a new car. He explained that by rebuilding was meant taking the car apart in the shops, repairing or replacing parts that were not as good as new and reassembling and readjusting the parts so that they would work together as a perfect machine.

Defendant rode in the car with the solicitor and, noticing that it rattled and creaked in some places, was told that it still needed a little "tuning up" which would remedy such small defects and which would be done at the shops before delivery. So far as outward appearances disclosed, the car was in first-class con-

dition and the defects which afterward appeared and showed that it had not been rebuilt or generally over-hauled at the shops, did not become manifest until after defendant had used the car several months, and had run it about 1500 miles. The written contract of sale which was executed by the parties contained agree-ments from which we quote: ''Kansas City, Mo., 12-18-11. 1 Second-hand phaeton 1911 Model No. 16637, $3100. Deposit $500. Balance, $2600. Payable as fol-lows: Cash on delivery of car, $1750. My note for $850, payable in installments, as follows:'' (and then follows the installments on the note.) ''The car is to be given a general inspection and tuning up so that it can be delivered in good running condition. The equip-ment that goes with the car without extra charge is, as follows: 2 Extra used tires complete, with extra rims as delivered to E. P. Moriarty & Co., with the car. 1 Windshield attached, Seat Covers, trunk rack, bumper, used weed chains, and the usual standard equipment that came with the car when new. Car to be deliv-ered—on or before December 27, 1911. All Packard cars are sold under the Standard Warranty of the Na-tional Association of Automobile Manufacturers. All promises, verbal understandings or agreements of any kind pertaining to this purchase not specified herein, are hereby expressly waived. Shorten Clutch and break pedals one inch—no charge—Graham. New w. glass in lower half windshield—no charge.—T. B.''

In the following Spring defendant noticed that the engine was not running well and early in the summer he took the car to the Packard shops to have it ex-amined. He states ''they told me I would have to wait some little time, as they had a small shop and lots of work, before they could look into it. So, at that time I had other business up in Nebraska—and that was the time of year that I spend about a month up there—so I didn't do anything with the car, just put it away until I came back, and then I went over and they told

me that they would investigate and see what was the matter with it. . . . They investigated it and they sent for me and I went over there; and in a few days following after they had taken the car in, and when I went in there, I found they had the motor all to pieces. . . . We took the whole engine all to pieces, and took the whole car to pieces—and all the driving parts of the car and the wearing parts of the car were very badly worn. We had to replace almost all of the wearing parts of the car and rebuild it back up again.''

Moriarty & Company rendered a bill to defendant for the work thus done, the total cost of which was $279. The bill contained an item of $75, for repainting the car and some other items relating to defects which must have been patent at the time of the sale. Indeed, it is contended by counsel for plaintiff that ''the repairs made on the car for appellant were practically all of parts which could readily be inspected,'' but we find this statement is not sustained by the evidence. The superintendent of the shops, introduced as a witness by plaintiff testified:

''Q. What condition did you find the car in at that time? A. Well, we found it in such condition that we thought it should be overhauled.

''Q. Will you please state to the jury, if you recall, what you found that was wrong with the car that required its being overhauled at that time? A. Well, the main bearings were loose, and, also the connecting rod bearings.

''Q. First, let me ask you: You say you overhauled it. What do you mean by that? A. What I mean by an ''overhaul,'' is to take the car down from top to bottom and overhaul every part of it, inspect it and clean it.

''Q. Did you take out the worn parts and replace them? A. Yes, sir; all that were worn badly enough to warrant that.

"Q. Now, can you tell without taking a car down as you have described, how much the parts inside of it are worn? A. No; you can't.

"Q. After that work was finished, was a bill made up there by you for the Packard people showing what was done to the car? A. This bill was not made up by me. It was O. K'd by me.

"Q. Was it inspected by you? A. Yes, sir.

.    .    .    .    .    .    .    .    .

"Q    Just state whether or not those were the things you did to this car? A    Yes, sir.

"Q. Do the charges that appear on that statement represent the fair and reasonable value of the work you did on the car, as shown by the statement? A. Yes, sir.

"Q. Now, after a car of that character—that is a high-priced car, isn't it? A. Yes, sir.

"Q. After a car of that character has been completely overhauled and put in first-class condition, how far ought it to run around the streets in Kansas City here, with careful driving, before the parts would begin to get worn to such an extent as you found the parts worn in this car, if you know? A. That is a very hard question to answer for this reason: One man can drive a car and get ten thousand miles out of it; and another man will run the same kind of a car five thousand miles, and it will be in worse shape than the other one.

"Q. I say, with careful driving? A. He might be ever so careful and still not be so experienced.

"Q. Well, suppose he is experienced? A. We generally consider a car, after we have overhauled it, good for fifteen thousand miles."

.    .    .    .    .    .    .    .    .

"Q. You didn't know how bad it was until you got inside of it? A. No; but I can tell the difference. We wouldn't have torn it down if there had not been some reason for it.  .  .  .

"Q. What were the repairs to the wheels? A. The repairs to the wheels were setting and resetting the bands. That is, the outside bands of the wheels were shrunk on.

"Q. They were perfectly apparent to anyone who observed them? The bands are apparent, they are on the outside? A. Yes, sir.

"Q. What are the absorbers? A. The shock absorbers. They are made by the Hartford people, and they are to take the rebound of the car.

"Q. Where are they located on a machine? A. They are located at each wheel, just above where the wheel sets, as a rule.

"Q. Are they outside or inside? Are they incased in anything? A. No; they are on the outside.

"Q. Where you can see them? A. Yes, sir.

"Q. What about the speedometer? It is on the outside, so that it is apparent, where anyone can see the condition of it by looking at it? A. Yes, sir, as far as the outside of it is concerned. You couldn't tell what the inside of it was.

"Q. Of course, the springs are apparent to anyone who might observe them? A. No, you wouldn't detect the springs unless there was some rattle in them.

"Q. You mean the rear springs? A. Yes, sir.

"Q. Are they concealed in any way? A. No; they are out of sight.

"Q. You say here on this bill that you removed the rear springs; what was that for? A. We had to remove them to punch them. The holes in the springs were worn somewhat, and Mr. Flick complained of the noise. The spring bolts didn't take up all that wear. He asked me if I could fix them in any way and I told him I would rebore them and remove that. We had to rebore the springs and we had to remove them in order to get them under the machine. . . .

"Q. The speedometer and these things that the court has inquired about here, could you tell by looking at those things from the outside what the condition of the inside of those things was? A. No. But if you looked at the speedometer and it was running all right you would naturally suppose it was all right.

"Q. But you couldn't tell the condition of those things until you took it down and rebuilt it? A. No, sir."

It is apparent from this testimony that the car had a number of hidden defects at the time of the sale which could have been discovered only by taking it apart in the shops and examining the various parts of its mechanism. It is conceded that except for some little "tuning up" which did not require a detailed inspection of the different concealed parts nothing was done to the car at the shops before the sale. Defendant paid the repair bill and alleges it as one of the items of his damage.

There is no controversy in the evidence over the fact that the manufacturer of the Packard cars had not set a price on the car under consideration and it is claimed by defendant that if the car had been rebuilt as represented its fair market value would have been $400 less than the price stipulated in the contract. The court, however, would not allow defendant to introduce evidence in support of this claim.

The damages claimed by defendant are matters of recoupment and not of counterclaim and since the note sued upon by plaintiff grew out of the contract of sale which defendant asserts he was induced to enter by fraud and deceit "any questions of recoupment between the parties to the note should be treated as though the suit had been on the original contract itself." [Langdon v. Markle, 48 Mo. 357.] And the defense, if well founded, should be allowed in an action by the assignee of the demand evidenced by the note, especially when it appears, as it does here, that the as-

signee purchased with knowledge of the facts on which the defense is predicated.

We shall consider the case as though it were prosecuted by the partnership upon the contract of sale for the recovery of the remainder of the purchase price of the car and shall examine into the question of whether or not the evidence most favorable to defendant is sufficient to take to the jury the pleaded issue of fraud and deceit.

On the discovery of the alleged fraud defendant made his election, not to rescind the contract, but to avail himself of the rule which accords to a vendee who has been induced to enter into a contract of sale by the fraud and deceit of the vendor, the right to stand on the contract and recover damages for the tort committed by the vendor in inducing the sale by fraud. [Harms v. Wolf, 114 Mo. App. l. c. 394; Noel v. Hughes, 152 Mo. App. 192.]

To maintain his right to diminish the stipulated price of the car by the amount of damages he sustained in consequence of the fraud, it devolved upon defendant to show, first, that false representations of material facts were made to him; second, that he believed them to be true, third, that his reliance on them was an act of ordinary prudence, and, fourth, that they influenced his action. If any of these elements is unsustained by proof, the whole defense must fail. [Foundry Co. v. Heskett, 125 Mo. App. 516, and cases cited.]

The rule of *caveat emptor* imposed on defendant, who had an opportunity of inspecting the car before buying it, the duty of making a reasonable examination and as to those defects which would have been discoverable to one in his situation who observed reasonable care, he cannot complain of the false representations of soundness. Where a vendee by neglect and indifference to his own interest permits himself to be overreached, the law affords him no redress, be-

cause his own conduct is blameworthy. If he has the opportunity, he must investigate; if the article is before him and its defects are apparent, he may not rely on the statement of the vendor that the article is sound, but must look for himself. If he can read, he must read the contract of sale before its execution, and may not take the vendor's word as to its contents. In short, the vendee must make reasonable use of opportunity and his failure to do this leaves him remediless, no matter what the conduct of the vendor may be.

*Caveat emptor* does not apply to hidden defects which are not open to discovery by a vendee who exercises reasonable care in the examination and testing of the subject-matter of the negotiation. As to such defects he is entitled to rely upon representations of soundness made by the vendor, and the latter will not be heard to say that the vendee should not have believed him.

"The general rule seems to be well settled that where the parties deal fairly or at arm's length, the rule of *caveat emptor* as above indicated applies, but when fair dealing is departed from by the vendor making false statements of fact as of his own knowledge, the falsity of which is not palpable to the purchaser, the purchaser has the undoubted right to rely implicitly upon such statements and the principle has no application, and in event the purchaser is entrapped thereby and afterwards calls upon the vendor in a court of justice to make compensation for his deceit, the law will not permit him to escape by urging the folly of his dupe nor by admitting that he, the seller, was a knave and a scoundrel, and averring the defrauded party was negligent and careless in thus believing and trusting him, for this would be equivalent to saying, 'You trusted me, therefore I have a right to betray you.'" [Judd v. Walker, 215 Mo. l. c. 330.]

Further it is said in that case "It has sometimes been loosely said that the negligence of the vendee will

prevent recovery for the fraud of the vendor. The word 'negligence' used in that connection, as we understand its meaning in the law of negligence, is an unhappy expression. Fraud is a wilful, malevolent act directed to perpetrating a wrong to the rights of another. That such an act in a vendor should not be actionable because of the mere negligence or inadvertence of the vendee in preventing the fraud, ought to be neither good ethics nor good law. If one voluntarily shuts his eyes when to open them is to see, such a one is guilty of an act of folly (in dealing at arm's length with another) to his own injury, and the affairs of men could not go on if courts were being called upon to rip up transactions of that sort. . . . In such case the fraud is made innocuous by the fact that it was patent to the vendee. The vendee is held to know what his own eyes would disclose, and, knowing, could not be deceived. But when an element of wilful deception leads up to a transaction, the whole situation changes. . . . It ought not to be held that trust cannot be put in a positive assertion of a material fact, known to the speaker and unknown to the bearer, and intended to be relied on.''

Certainly under this rule defendant was justified in relying—and his evidence shows that he did rely—upon the representation that the car had been rebuilt. He knew that it had not been freshly painted since that fact was apparent and he cannot be allowed to include the cost of repainting in his damages sustained in consequence of the false and fraudulent representation that the car had just been rebuilt, nor may he include the cost of any repairs or defects which existed and were obvious at the time of the purchase. And on the hypothesis, which finds some evidentiary support, that the obvious defects were of such a nature as to conclusively negative the representation and to show that the car had not been taken apart and thoroughly restored to a perfect condition of repair, we think de-

fendant would be in the position of a vendee who fails to make a reasonable use of his opportunity for examination and blindly trusts in an obvious falsehood.

But there is ample evidence to support the conclusion as one of fact that the defects open to discovery on a reasonable examination were those which would be remedied in "tuning up" the car and were not contradictory of the representation that the machinery and other important concealed parts had not been thoroughly overhauled and restored by repairs and replacements to their pristine condition.

For example there was nothing in external appearances or in the trial of the car to indicate that the engine had not been thoroughly overhauled and rebuilt, and defendant was in the position, known to the solicitor, of being compelled to rely upon the representation that it had been. The same may be said of the speedometer which appeared to be in first-class condition but had not been rebuilt and was in a worn and defective condition. As to all such defects, if any, existing at the time of the sale, the representation (if made) that the car had just been rebuilt was false and fraudulent and defendant cannot be said to have been remiss in relying upon it.

But it is argued that this representation, together with all other oral statements and agreements, were merged in the written contract.

There is no question in the case of negligence of the vendee in signing the written contract of sale without reading it. Defendant does not claim that he was imposed upon by the fraudulent substitution in the written contract of a different agreement from that actually made by the parties. The terms of the instrument are not inconsistent with the representation that the car had been rebuilt and this is a case where the signing of the written contract by the vendee was the fruition, the crowning end and purpose of the fraud. Such fraud cannot be merged, nor will its perpetrator

be allowed to retain its fruits wrongfully seized, because, forsooth, he succeeded in accomplishing the very thing he started out to do. Quoting again from Judd v. Walker, l. c. 335: "The fraud, resting in parol, may be proved by parol, and the written documents were mere steps in that proof. It is elementary that a grantee, defrauded as was Judd, is not obliged to sue on the covenants of warranty in his deed nor need he go into equity to rescind the contract, but he may hold what he got under the contract and sue at law for his damages."

The court erred in not submitting the issues of fraud and deceit to the jury on the theory that there was substantial evidence tending to show that the representation that the car had been rebuilt was false and fraudulent, was relied upon by defendant; that such reliance was an act of ordinary prudence and that defendant was entitled to recoup the cost to him of the repairs of concealed defects which existed at the time of the sale.

The court properly excluded evidence tending to show that the market value of the car was less than the price defendant paid. The representation that the price had been fixed by the manufacturer was not material and amounted to nothing more than the untrue assertion of a vendor that he will not take less than the price he is asking.

Courts do not interfere with the rights of people to make their own bargains and contracts. In countries where the rule of *caveat emptor* obtains it is not considered unlawful for a vendor to sell above the market price of the article, or for the vendee to buy below it. It is immaterial whether the market value of the car, if it had been rebuilt as represented was $3100 or $2700, or whether the sales agent could or would have accepted a lower price than that at which he sold the car to defendant.

The judgment is reversed and the cause remanded. All concur.