Dalrymple v. Craig.

DALRYMPLE et al. v. CRAIG, Appellant.

Division One, April 14, 1899.*

1. **Equity:** APPELLATE PRACTICE: FINDING OF FACTS: FRAUD: RELEASING DEED OF TRUST. If the evidence shows that the chancellor is in a better position to judge of the credibility of the testimony, a corresponding deference should be shown to his finding of facts. But even then the responsibility of finding the facts still rests on the appellate court. And in this case the evidence is reviewed, and the conclusion reached that the trial court was in error in holding that the defendant through fraud obtained from plaintiffs a release of a deed of trust which they held against him.

2. ———: CURATOR'S TESTIMONY: PRESUMPTION. When a curator who has lost his ward's estate, undertakes to explain that he is not to blame for the loss, that he derived no advantage from it and in no wise defrauded his ward, he enters upon such explanation with the presumption of fraud against him, and faced by a demand from the law of the most satisfactory proof. But no such presumption can be indulged against a curator who did not squander the estate, but only contracted to make good the loss made by a previous curator.

---

*NOTE.—Decided March 31, 1899. Motion for rehearing filed. Motion overruled April 14.

Dalrymple v. Craig.

3. ———: MISREPRESENTATIONS: VALIDITY OF DEED OF TRUST. . A rep resentation by a debtor to his creditor that a deed of trust which the latter holds against him is insufficient in law and "not a good and subsisting lien," is merely an expression of a legal opinion, and hence it is not material if he further states that lawyers have been employed to contest its validity.

4. ———: ———: PREPONDERANCE OF EVIDENCE: NUMBER OF WIT-NESSES. If there are no well established facts and circumstances impeaching the evidence of one side and corroborating the testimony of the other, and the witnesses are equally interested and equally credible, the preponderance will be on the side of the greater number of witnesses. But in this case it is held that though the three witnesses for plaintiffs agreed. in testifying that the defendant had represented to them that he had placed $700 in the hands of their uncle for them, yet defendant's positive denial is so corroborated by the facts and circumstances that their evidence fails to prove either that defendant was guilty of fraud or that they suffered by reason of the settlement made with him. ,

5. ———: PARTIAL PAYMENT: OVERPLUS. The proposition of law that "the payment of a smaller in discharge of a larger sum admitted to be due, is no payment of the overplus," is not a true proposition of law if the smaller sum was paid before the debt was due, or if the payment was not made out of the debtor's funds or out of funds at his absolute disposal.

*Appeal from De Kalb Circuit Court.*—HON. W. S. HERNDON, Judge.

REVERSED.

THOMAS J. PORTER and SAMUEL G. LORING for appellant.

(1) The court erred in refusing the first declaration of law prayed for by the defendant. It is not disputed that at the time these plaintiffs received from the defendant the $1,000 in full settlement of all their indebtedness against him, the two notes in evidence were more than two years under due. The receipt by them of the $1,000 was a valid consideration and sufficient to support said settlement. Henson v. Stever, 69 Mo. App. 140; Brooks v. White, 2 Met. 283; 1 Am. and Eng. Ency. of Law, 100. (2) Assuming,

Dalrymple v. Craig.

but not admitting, that Craig made to the plaintiffs all the representations stated in their bill of complaint, and that those representations were false, still it devolved upon the plaintiffs to show that Craig intended that the plaintiffs should act upon those representations. 5 Am. and Eng. Ency. of Law, 330. And that they did act upon them. Cary v. Hamilton, 118 Ind. 568; Kerr on Frauds and Mistakes, pp. 75 and 77. (3) No rule of law is better settled than when a party can protect himself by ordinary care and prudence he must do so, and if, with full means of knowledge being equally able to judge of a matter for himself, he relies upon the representations of another with whom he stands on equal footing, without exercising the means of knowledge open to him, neither the courts of law nor of equity will relieve him from the effects of his folly. 8 Am. and Eng. Ency. of Law, 643; Lewis v. Land Co., 124 Mo. 687; 2 Kent's Com. (13 Ed.), 485; Palmer v. Bell, 85 Me. 355; Savage v. Stevens, 126 Mass. 207; Parker v. Moulton, 114 Mass. 99; Insurance Co. v. Reed, 33 Ohio St. 292; Board of Com. v. Younger, 29 Cal. 176; 1 Story's Eq. Jur., sec. 195. (4) Both on the trial of the case and ·in the motion in arrest of the judgment, plaintiffs refuse, even by the allegations in their said bill, to place this defendant *in statu quo.* This they must do before they can recover. 1 Beach Mod. Eq. Jur., sec. 78; 2 Pomeroy, Eq. Jur. (2 Ed.), sec. 897; Estis v. Reynolds, 75 Mo. 565; Taylor v. Short, 107 Mo. 384; Carson v. Smith, 133 Mo. 614; Cobb v. Hatfield, 46 N. Y. 537; Hemminger v. Heald, 52 N. J. Eq. 437; Grass v. Scott Manuf'g Co., 48 Fed. 39; Hammond v. Wallace, 85 Cal. 527; Bell v. Baker, 43 Me. 87.

HEWITT & BLAIR and HARWOOD & HUBBELL for respondents.

(1) This court will defer to the findings of the chancellor in this case. Roberts v. Herryford, 54 Mo. App. 371;

Clark v. Bank, 57 Mo. App. 287; Ford v. Phillips, 83 Mo. 529. (2) The notes at the time of the payment of the $1,000, July, 1894, were ripe for foreclosure and due for that purpose, if for none other. The notes and trust deed should be construed as one instrument. Noel v. Gains, 68 Mo. 649; Owings v. McKinzie, 133 Mo. 323. (3) When an unquestioned claim has been "compromised" by the payment of a smaller sum than that clearly due and such payment was induced by the fraud of the debtor no offer to return the amount received is necessary before suit for balance or at other time. Girard v. Wheel Co., 46 Mo. App. 116; Alexander v. Railroad, 54 Mo. App. 71; State ex rel. v. Jones, 53 Mo. App. 220; Ins. Co. v. Howard, 13 N. E. 104; Kley v. Healey, 28 N. E. 595. (4) One who attempts to rescind a transaction on the ground of fraud is not required to restore that which in any event he would be entitled to retain either by virtue of the contract sought to be set aside, or of the original liability. Kley v. Healey, 28 N. E. 595; Millard v. Farley, 15 La. Ann. 518. (5) Whether the doctrine of laches is applicable should be determined with reference to the particular facts of each case. Schradski v. Albright, 93 Mo. 48; Canton v. McGraw, 11 Atl. 287; Caldwell v. Davis, 15 Pac. 696; Fellows v. Hyman, 33 Fed. 313. (6) It has been held that the rule that a contract can not be rescinded unless the parties can be placed *in statu quo*, does not apply where one party has obtained advantage over another by means of fraud, where such rescission would further the ends of justice, and the courts can still reach and enforce equities before them. Coffee v. Ruffin, 4 Coldw. 487; Turner v. Clay, 3 Bibb. 52; Conlan v. Roemer, 52 N. J. L. 53; Downer v. Smith, 32 Vt. 1. (7) When representation is made of a fact, which has nothing to do with opinion and is peculiarly within the knowledge of the person making it, the one to whom representation is made has the absolute right to rely on its truthfulness

although the means of ascertaining its falsity are fully open to him. Carmichael v. Vandebur, 50 Ia. 651; Pomeroy v. Benton, 57 Mo. 542; Bank v. Hunt, 76 Mo. 445; Wannell v. Kem, 57 Mo. 491; Cottrill v. Crum, 100 Mo. 403; 21 Am. and Eng. Ency. of Law, 31; Kley v. Healey, 28 N. E. 595. (8) If Craig made the representations charged and made them as matters of fact and they were false, and respondents relied on them, it makes no difference whether he knew of their untruth or not. The law imputes to him a fraudulent purpose. Caldwell v. Henry, 76 Mo. 260; Hamlin v. Abell, 120 Mo. 201; Herman v. Hall, 140 Mo. 277. (9) A guardian is governed by the same rules as a trustee. He can not bind his ward by a contract injurious to the latter, nor buy or use his ward's property for his own use, benefit or profit, or as agent for another. All advantageous bargains inure to the ward. Woerner's Law of Guardian (1 Am. Ed.), chap. 8, sec. 60.

VALLIANT, J.—This is a suit in equity to set aside a deed releasing a deed of trust, on the ground, as alleged, that the deed of release was obtained by fraud.

The petition states, substantially, that in 1886, the plaintiffs were minors and that defendant was by the probate court of DeKalb county duly appointed and qualified as their guardian and curator; that as such curator he received large sums of money and property belonging to plaintiffs; that plaintiffs attained their majority in September, 1890, and 1891, respectively, and upon coming of age demanded of defendant the amount shown to be due them on his final settlement in the probate court, but he neglected to pay them, and on October 12, 1891, he was indebted to them on this account in the sum of $2,121.75; that to secure this amount he executed three negotiable promissory notes of that date, one for $900, one for $921.75, both due in five years, with eight per cent interest from date, and one for

$300 due in ten days, and executed a deed of trust to secure the two five-year notes, conveying two eighty acre tracts in that county. The defendant's wife joined in this deed. It was duly acknowledged and recorded. That in July, 1894, plaintiffs then living in Ohio, defendant visited them at their home, and with intent to defraud them falsely represented that "the lien of the deed of trust was not a good and subsisting lien" and he had employed a firm of lawyers in St. Joseph to defeat it; that he had delivered to plaintiffs' agent and attorney in Maysville, Missouri, "one pair of mules of the value of three hundred dollars, one good bankable note of the value of three hundred dollars, and cash of the value of one hundred dollars;" that the prior liens on the land were equal to its value, that he was insolvent, but that his father would let him have $1,000 to pay plaintiffs in full satisfaction of their debt to avoid litigation; that plaintiffs believed these representations to be true, relied solely on them, accepted the $1,000 offered, and executed the deed of release in question, whereby the deed of trust was released; that all of these representations were false and defendant knew it, and plaintiffs were deceived and defrauded thereby.

Defendant by his answer denies the charges of false representations, admits that he was appointed curator, but denies that he ever received any money or property of plaintiffs; he avers that one Austin Craig had been their curator, and becoming financially involved, induced defendant to take the office and assume the liability, which he did, but found himself unable to pay it; plaintiffs instituted suit and recovered judgment against him, and being unable to pay the judgment, at the request of plaintiffs' attorney he executed the notes and deed of trust mentioned, with the understanding that they were in full satisfaction of the judgment; that afterwards, in 1894, plaintiffs having written to defendant demanding payment, and he being insolvent and unable to pay the debt, arranged to borrow $1,000, which was all he

could do, to try to effect a settlement; then he went to Ohio where plaintiffs lived, and proposed to settle with them for $1,000, and requested them to correspond with such persons as they might see fit at Maysville to verify all statements he made; that he advanced them $50 on their agreeing to make the settlement, and returned home, and plaintiff Charles Dalrymple went to Maysville, investigated the matter, delivered the deed of release, and received the remaining $950.

After due trial there was a final decree for the plaintiffs at the October term, 1896, of the DeKalb Circuit Court, setting aside the deed of release, declaring the deed of trust in full force for $1,489.85, the balance due on the notes after giving credit for the $1,000 paid for the release, directing a foreclosure of the deed of trust, application of the proceeds to payment of the amount so found due, and general execution against defendant for what might be left unpaid.

Motions for new trial and in arrest followed, and the cause is here on appeal.

I.   There are several questions of law discussed in the interesting briefs with which the counsel have favored us, but the question of first importance in this case is one of fact. Did the defendant make those false representations with which he is charged? If yes, we will go on to other questions; if no, that is the end of plaintiffs' case.

This is an equity case, and this court must weigh the evidence to find the facts. Sometimes it appears from the record in an equity case that the evidence is of such a character as to show that the chancellor was in better position to judge of its credibility than the appellate court; in such case there should be a corresponding deference to his findings; but even then the responsibility of finding the facts is not lifted from this court. [Blount v. Spratt, 113 Mo. 48; Parker v. Roberts, 116 Mo. 657.] In this case there is little if anything to indicate that the chancellor had any better point of observation than those who read this record.   The

plaintiffs' testimony on the main question was in the shape of depositions, and the defendant's testimony on the same point is very fully and even graphically reported, while the circumstances impeaching and corroborating are undisputed.

Although under the conceded facts of· this case the defendant, at the time of the negotiations under investigation, was indebted to the plaintiffs in the amount found due on his final settlement in the probate court, and which was afterwards merged in the judgment against him in the circuit court, and which he had again acknowledged in his notes and deed of trust of date October 12, 1891, yet that was only the obligation of a cold contract; he was so bound because it was so nominated in his bond. In point of fact he had never received one cent of plaintiffs' money, had never handled anything of theirs. The estate their father had left them had been squandered by their former curator. And nobody was deceived by this defendant's assuming that burden. The sureties on the former curator's bond had moved against him in the probate court on the ground that he was squandering the estate; they knew, and the probate court knew, and the attorney and uncle of these plaintiffs, then minors, knew that when this defendant came into the case he was simply assuming responsibility to those children for their estate that had already been squandered by their former curator. The attorney and uncle then representing those minors, acted as the attorney in effecting the transfer of the curatorship from one to the other. This defendant agreed to assume that responsibility in consideration of the conveyance to him of an eighty acre tract of land, which after the transaction was closed, he found to be mortgaged for as much as it was worth, and the attorney and uncle of these plaintiffs drew the deed. There is nothing in the evidence on that point to indicate that the attorney and uncle of the plaintiffs acted otherwise than in good faith and with good judgment, to save what he could for them, but reference to his activity in that

Dalrymple v. Craig.

matter is made to show that so far as this defendant was concerned there was nothing concealed and no deception practiced.

The defendant became bound by that obligation and was liable to its full extent as a matter of contract, as a matter of assuming another man's obligation, but he has betrayed no trust, and if, when his obligation became due, he had not the money to meet it, it was not because he had squandered funds that had been placed in his hands to take care of.

The fact that nothing ever came into his hands as curator, the fact that when he assumed the curatorship there was no estate to take care of, does not impair his liability under his contract, but it does put him on a very different plane, both as to his credibility as a witness, and the character of proof required of him. A man into whose hands an estate belonging to children has been intrusted, and who betrays his trust, is justly treated with more suspicion, when he undertakes to defend his conduct, than a man who has merely improvidently taken upon himself an obligation which he is unable to fulfill. The former may be able to show that he was blameless for the loss of the estate, and if he settles with his ward for a sum less than is due, he may be able to show that in the settlement he dealt with the utmost fairness, and for the best interest of his ward, and no advantage to himself at his ward's expense; but he enters into that explanation with the presumption of fraud against him, and a demand from the law of the most satisfactory proof. And this presumption and demand are not founded on mere technical relation between the parties, but is founded upon the principle that men who betray such trusts are corrupt, and if they do such thing they are not too good to swear falsely when it is to their interest to do so.

But this defendant is not amenable to that accusation. He owed these plaintiffs money, but he owed them nothing

else.     They were entitled at his hands to honest and fair dealing, but he had a right to deal with them as he would deal with other people.

The learned chancellor who tried this case, in his written opinion filed, says that he disregarded all evidence tending to show that defendant had not in fact received anything of the plaintiffs' estate; and thus he weighed defendant's evidence and adjudged defendant's conduct as he ought to have weighed the evidence and adjudged the conduct of a man who had squandered the estate of his ward, and had settled with him for about half that was due.    That was disregarding the real facts to give effect to the nominal condition.

II.     The charges of fraud are that defendant falsely represented that the lien of the deed of trust was "not a good and subsisting lien," that defendant had employed lawyers in St. Joseph to fight it; that he had already given money and property to plaintiff's attorney and uncle, to the amount of $700; that defendant was insolvent, but that his father would help him to the extent of $1,000 if he could settle at that sum.    As to the alleged misrepresentations concerning the validity of the lien, if the plaintiffs mean that defendant stated that it was insufficient in law, that was the expression of a mere legal opinion, and the statement that the St. Joseph lawyers were employed to contest the deed on that ground was immaterial.     But plaintiffs do not mean that; they say that he told them there were prior liens on the land for as much as it was worth; he says that he told them the land was mortgaged and that if it were sold he did not believe there would be anything for them.     The evidence shows that there were prior incumbrances; whether or not the prior incumbrances were equal to the value of the land was to some extent a matter of opinion.     The eighty acres which the former curator had transferred to defendant, was included in a mortgage for several times its value, which mortgage covered also other lands, of the value of which we

are not informed, and was past due and liable to foreclosure at any time. If the equity of redemption in that eighty acre tract had any market value, the plaintiffs made very little effort to show it. The other eighty acres, which was defendant's homestead, was mortgaged for something over $500 (principal), upon which interest had accumulated to make it about $800. The estimate of value placed upon it by the various witnesses ranged from $18 to $30 an acre; the highest estimate being given by Mr. Hewitt, one of plaintiffs' attorneys, who said that defendant had at one time placed it in his hands for sale at $30 an acre, but he could get no offer for it. Mr. Bunton's estimate was from the conservative banker's standpoint and he estimated it at from $18 to $20 an acre. If the land under a foreclosure sale would have brought $20 an acre, there would have been about $800 left for plaintiffs after paying the prior mortgage. They say he told them that he was insolvent, but that his father would advance him $1,000 if they would settle with him at that sum. If he told them he was insolvent, that was the truth; if he told them his father was to advance him the $1,000, that was not the truth, for he had arranged to borrow it from Mr. Bunton; but if their insolvent debtor had arranged to get the money for them, the particular source from which it was to come was not material. So far as relates to the alleged deception in regard to the value of their security, it is in the nature of an opinion, and the facts upon which the opinion was based were easily within the reach of the plaintiffs, and the evidence shows that before closing the transaction the plaintiff, Charles Dalrymple, went to Maysville, sought out the man who held the prior mortgages, and advised with him on the subject. Even by their own evidence they have no right to complain on that point.

But the ground on which plaintiffs chiefly rely is the alleged false representation that defendant had placed in the

hands of their attorney and uncle at Maysville $100 in money, a bankable note for $300, and a pair of mules worth $300.    The two plaintiffs and their mother in their depositions state, in almost the same words, that he made these statements, that they believed them, relied on them, and executed the deed of release on the faith of them.    Defendant in his testimony in open court denied most emphatically having made such statements.    The learned chancellor at this stage in the case said that these witnesses were equally interested and equally credible, and the preponderance was with the plaintiffs; thus seeming to yield the preponderance to the greater number of witnesses.    If there were no well established facts and circumstances impeaching the one story and corroborating the other, the natural inclination of the scales would be towards the greater number of witnesses.    But there are some facts in this case that are heavier than the mere breath of a witness.

There was a gentleman living in Maysville who was the uncle and attorney for these plaintiffs.    He had been their attorney and guarded their interests at every stage of the case through the probate court, the circuit court, and in obtaining the deed of trust in question, and he still had those notes and deed of trust in his hands.    Personally this defendant was an entire stranger to the plaintiffs and their mother, had never seen either of them until he went to Ohio, although he well knew their uncle at Maysville.    They wrote him several letters importuning him for a settlement, and these letters induced him to go and see them.    But before going he made arrangements to borrow $1,000, which he left subject to his check in bank in Maysville; he also had the deed of release in question prepared by an attorney which he took with him.    Plaintiff Charles was then about twenty-four years old, and his sister three years younger, married and keeping house with her husband.    Up to the time he went to Ohio, if there had ever been any feeling of distrust

between these plaintiffs and their kinsman in Maysville, or any interruption of their friendly relations, there is no intimation that this defendant knew anything about it. This gentleman was a well known and reputable lawyer. They do not pretend to say that defendant said or intimated to them that their uncle and attorney had appropriated this money and property to his own use, or that there was any suspicion of wrongdoing on his part; on the contrary, they seek to give the impression that the defendant gave them to understand that this money and property that he had given their uncle, was still in his hands for them, and they were to get it from him, besides the $1,000 from defendant.

Now after these parties had talked the matter over in Ohio, and had agreed tentatively on the terms, the deed of release signed and acknowledged, but retained by the plaintiffs, defendant advanced $50 of the $1,000 to them to pay the expenses of Charles to Maysville where the balance of the money was to be paid and the deed of release delivered. Charles says that the understanding was that he was to go to Maysville simply to get money and deliver the deed; defendant says it was that he was to investigate and take advice and close if it was satisfactory. Whether we take the statement of one of these witnesses or the other, the fact remains that defendant furnished Charles the means to go to Maysville before closing the transaction. If defendant had made the misrepresentations charged, is it not most improbable that he would have furnished the plaintiffs with means by which the falsity of his statement would almost inevitably have been discovered before the transaction could be closed? If he had told this young man that he had given his uncle and attorney $700 worth of money and property for him, knowing at the same time that it was false, would he risk sending the young man, before closing the transaction, to the town where that uncle lived?

True, defendant testifies that Charles spoke disparagingly of his uncle, and requested defendant to say nothing

about the settlement until he had received the money; but the uncle knew nothing of the negotiations then going on, and the keeping of the negotiations secret until the money should be paid over was not at all inconsistent with asking the uncle for the $700 worth of money and property before proceeding further with the matter.    The most natural thing for the young man to do, as defendant might reasonably have supposed, was to go to his uncle and inquire about the money and property alleged to have been received by him. This he could have done, while keeping his own counsel about the $1,000 he was about to receive, and run no risk of having to pay any of it out for attorney fees.

The evidence showed that Charles, whatever his motive may have been, was shy of his uncle when he got to Maysville; he reached there Saturday evening, went to a hotel and told a young friend there that he wanted to see Capt. Ewart before he saw his uncle.    The next morning (Sunday) he saw Capt. Ewart in his bank, and talked with him about the proposed settlement, and Capt. Ewart advised him it was the best thing he could do.    Capt. Ewart was the banker who held the prior mortgages.    After receiving this advice, plaintiff Charles delivered the deed of release to the cashier of the bank, and received the balance, $950, that had been left there for that purpose.    That was on Sunday.    Plaintiff had not seen defendant since they parted in Ohio.    On Monday plaintiff called on his uncle and told him he had settled for $1,000.

The learned chancellor got the impression that Charles, after getting the $950 at the bank, went to his uncle and demanded the $700 worth of money and property that he understood was there for him.    And much weight is given this supposed fact in the written opinion in the record.    But neither Mr. Hewitt nor Mr. Dalrymple testify directly to such a fact.    The nearest that Mr. Dalrymple came to saying

so, was when he said that it was not until after he had delivered the deed that he found out that the statement was false; and the nearest that Mr. Hewitt came to saying so, was that in the conversation he had with the young man in which he was informed of the settlement, he inferred that he was expected to turn over some $700 worth of property. Those statements fall far short of direct proof of a fact to which the chancellor attributed so much importance as to make it a turning point of the case in his mind. We must remember that this uncle had been the attorney for these plaintiffs for several years, had had professional business relations with their former curator for whom he had made some collections, had looked after the transfer of the estate from one curator to the other, had obtained the judgments against this defendant in the probate court and in the circuit court, and had in his possession, at the time this settlement was made, the notes and deed of trust in question; and concerning the details of all this business, even the existence of the notes and deed of trust, the plaintiffs had but little if any knowledge. Neither of those two witnesses has undertaken to give us the details of their conversation. It may be that in discussing the whole management of the estate the young man may have said sufficient for Mr. Hewitt to infer that they were expecting something from him, yet without saying that defendant had made these statements. The direct and explicit proof on this point was so easily within the giving of plaintiffs, and it would have been so natural for them to have given it if it was true, that they are not entitled to have it supplied with an inference. If the preponderance of the evidence is not with the plaintiffs on the point of the actual false statements alleged, their conduct since the settlement is consistent with the idea that they had simply come to the conclusion that they had made a bad bargain and were trying to get out of it.

But the preponderance of the evidence is not with them in support of their allegations of fraud. When these allegations were brought to the notice of defendant, he denounced them in words and conduct as promptly and emphatically as an honest man accused of such baseness might be expected to have done, and the undisputed circumstances of the case strongly corroborate his evidence.

Nor is the preponderance of the evidence with the plaintiffs on the proposition that it was a bad bargain for them. The defendant and the sureties on his bond were insolvent. The decided preponderance of the evidence is that the utmost value of the mortgage security was from $800 to $1,000, with the expense of foreclosure and the trouble of arranging for the payment of the prior incumbrancers. By this settlement they got $1,000 two years before their mortgage was due, without expense or trouble.

The evidence also shows that whatever representations defendant may have made, the plaintiffs did not rely upon them, but went to Maysville (one of them, at least), and closeted with Capt. Ewart, the banker and mortgagee, in his office on Sunday, obtained his advice and then acted as he advised.

The evidence fails to prove either that the defendant was guilty of fraud, or that the plaintiffs suffered in the settlement.

III. Plaintiffs in their brief lay down the proposition that the payment of a smaller as in discharge of a larger sum admitted to be due, is no payment as to the overplus. That is a correct proposition of law when limited to the facts thus stated, and nothing more.

But there is a good deal more in the facts of this case than embraced in the statement of that proposition. In the first place, as we have seen, the debt was not due, and in the next place, the plaintiffs got all their security was worth, or that they could have realized out of it in any way. But

chiefly, the $1,000 that was paid them was not paid out of their debtor's funds or out of funds at his absolute disposal. When defendant went to Mr. Bunton, the banker, to borrow this $1,000 he told him what he wanted it for, and it was loaned for that purpose. Bunton was familiar with his affairs, had been lending him money to use in his cattle business for years, regarded him at this time as insolvent, but had confidence in him and agreed to lend him this $1,000. It is fair to presume that the purpose for which this money was to be used, lifting the mortgage from his customer's homestead, entered largely into the banker's estimate as an inducement to make the loan. At all events the money was put at defendant's disposal for that purpose, and the plaintiffs got by this settlement a fund that was to them otherwise unattainable. They now think they should be allowed to hold on to the $1,000 and foreclose the mortgage for the balance of their claim. That would be to allow them to convert the law from a shield into a sword.

The plaintiffs have suffered wrong, but they have not suffered at the hands of this defendant. The motion to dismiss appeal and motion to affirm judgment are overruled.

The judgment of the circuit court is reversed. All concur.