CHARLES F. ALLGOOD, RESPONDENT, v. TARKIO ELECTRIC AND WATER COMPANY, APPELLANT.*

Kansas City Court of Appeals.   April 30, 1928.

*Corpus Juris-Cyc References:  Contracts, 13CJ, section 286, p. 387, n. 57; Fraud, 26CJ, section 106, p. 1207, n. 89: p. 1208, n. 92; p. 1209, n. 2; Release, 34Cyc, p. 1055, n. 73; p. 1056, n. 86; p. 1060, n. 11.

*Hickman & Hoyne* and *T. B. Hunt* for respondent.

*W. R. Littell, Frank L. Barry* and *Lathrop, Crane, Reynolds, Sawyer & Mersereau* for appellant.

FRANK, C.—This is an action to recover damages for personal injuries. Plaintiff recovered judgment in the sum of $1000 and defendant appealed.

Plaintiff was in the employ of defendant, Tarkio Electric and Water Company. Defendant's plant was equipped with three boilers which were so constructed and arranged that they could be operated singly, in pairs or altogether. On October 20, 1924, the day in question, plaintiff and another employee of defendant went inside the drum of one of these boilers for the purpose of cleaning it, and while there another employee of defendant turned steam and hot water into this boiler, as a result of which plaintiff was severely scalded and burned. The petition charges defendant with certain specific acts of negligence and alleges that said acts were the direct and proximate cause of plaintiff's injuries. Defendant's answer pleads (1) a written release, and (2) contributory negligence of plaintiff in failing to close the valves in the pipes leading to said boiler. Of this written release plaintiff's reply alleges:

"Plaintiff admits that he signed the instrument set out in defendant's answer, as a release on or about the 23rd day of December. 1924, but denies specifically that he knew what the said instrument contained, and denies that the said defendant informed him that it was a release of his right in and to his claim for damages against the defendant. And plaintiff alleges the fact to be that at the time of signing said instrument, the defendant, by its agents and representatives, induced the plaintiff to sign same, by telling him that he had no claim for damages, and that the laws of the State of Missouri would not allow him any damages, and that there was no way by which he could recover damages by suit in the courts of the State of Missouri, and further represented to him that he could not recover even his wages while he was disabled as the result of said injuries; but that the defendant was willing to pay his wages while he was recovering from said injuries; that relying upon the said representations of the defendant and its agents that he could not maintain an action for damages for his injuries under the laws

of the State of Missouri, and further by reason of his physical condition at the time, he being confined to his room and bed and suffering great physical and mental pain and anguish he signed the instrument, the contents of which he did not know, but supposed it was merely a receipt for his wages as represented to him by the defendant, through its duly authorized agents; that one of the defendant's agents who made the foregoing representations was F. L. Barry, an attorney from Kansas City, Missouri, and was representing the defendant at the time, and another of said agents who was present at the time of the signing of said instrument was Moore, manager of the defendant's light plant in the city of Tarkio, Missouri.

Plaintiff admits that he received the sum of $450 as paid by the defendant, but alleges the fact to be that afterwards, to-wit; on the 16th day of July, 1925, he tendered to the said defendant the $450, which said tender was valid and legal, and that said defendant, through its agents refused to accept said tender, and plaintiff now in this court hereby tenders and offers to the said defendant the sum of $450.''

Plaintiff was injured on October 20, 1924. The next day he was taken to the hospital at Maryville where he remained for six weeks, then returned to his home at Tarkio. After he returned home, his wife, at his request, went to the office of defendant and inquired what defendant would do about a settlement of his claim. About a week thereafter, Mr. Barry, an attorney representing defendant, and Mr. Moore, defendant's superintendent, called at plaintiff's home to see him. Concerning what took place between them at that time, relative to a settlement or release, plaintiff testified in chief as follows:

"Q. What, if anything, did Mr. Barry say to you? A. Well, he came up there and talked quite a little bit and about time to go to the train, he wanted to hurry home.

"Q. What did he want to hurry home for? A. To get ready for his children's Christmas. And finally he said, 'Charlie, what do you want me to do for you?' I said, 'Just everything you can.' 'Well,' he says, 'all I can give you is your wages.' 'Well,' I says, 'it looks funny, burn a man pretty near to death, and only give him his wages.' 'Well,' he said, 'that is all you can get, and lucky to get that.' He says, 'You can go to any lawyer that expects pay for what he tells you and that is what he will tell you,' he says, 'If you go to some of these quack lawyers down here, they will tell you you have a peach of a case.'

"Q. Well, what else? A. Well, that is about all he said.

"Q. What mention, if any, did he make relative to the laws of Missouri? A. He said I couldn't get nothing according to the laws of Missouri.

"Q. Well, did you then immediately sign the instrument? A. No, sir.

"Q. What did you do? A. Well, he says, 'I will go down and come back, and then you can think it over.' I said, 'All right.'

"Q. Now, when he left at that time, what instrument or papers or documents, if any, did he leave with you? A. Didn't leave any.

"Q. How long were they gone? A. Oh, I don't think over five minutes.

"Q. Who came back? A. Mr. Moore and Mr. Barry.

"Q. Did you have any further conversation with them? A. Yes, he came back and he says——.

"Q. Who is 'he?' A. Mr. Barry, he says, 'Well, what do you think about it?' 'Well,' I says, 'if that is all I can get, I better take that than nothing.' 'Well,' he says, 'that is all you can get.' I said, 'If that is all I can get, I better take that than nothing,' and he says, 'All right,' and he handed me a paper, and I told the woman to hand me my glasses, and agin she had the glasses, he had the check written out, and he gave it to me, and he said, 'Now, here, sign this,' and he had out a big pocketbook, and he said 'Here, sign it,' and then he took it over and laid it down on the table and said, 'Mrs. Algood, you sign it.'

"Q. What, if anything, did Mr. Barry or Mr. Moore here say that instrument was? A. They didn't say.

"Q. Did they read it over to you? A. No, sir.

"Q. Did you have an opportunity to read it over? A. No, sir.

"Q. What opportunity did you have to read it over? A. I didn't have any after I got my glasses so I could see.

"Q. If they stated to you at all, what kind of an instrument did they say it was? A Well, I thought I was just signing a receipt that I got the four hundred dollars.

"Q. What, if anything, did Mr. Barry say about Dr. Benham, if anything? A. Well, he said Dr. Benham said he thought you would be up and go to work in two or three months. 'Well,' he said, 'we will put it three months, and the three months, that would just cover—four hundred and fifty dollars would just cover three months' wages.'

"Q. Now, did you know at the time you signed this document that it was a release? A. No, sir."

On cross-examination, plaintiff testified as follows:

"Q. Mr. Barry told you, I think you said, if $450 didn't satisfy you, that that was what he could pay you, and for you to think it over and consider it, and he and Mr. Moore would leave and come back? A. Yes, sir.

"Q. And so they did leave? A. Yes, sir.

"Q. Your wife and your folks were there? A. Yes, sir.

"Q. And you did talk it over among yourselves? A. Yes, sir.

"Q. You decided to take the $450, and Mr. Barry and Mr. Moore came back? A. Yes, sir.

"Q. You told them you would take the $450? A. Yes, sir.

"Q. Well, then, you signed this paper along the middle of the afternoon, along about two o'clock, or half past? A. No, sir, it was after three.

"Q. What time did this train leave? A. Supposed to leave about three o'clock.

"Q. And you signed it after three o'clock? A. Yes, sir.

"Q. I see. Did you ask your wife to read it to you? A. No, sir.

"Q. Did you ask any of your children to read it to you? A. No, sir.

"Q. Did you ask Mr. Moore to read it to you? A. No, sir.

"Q. Did you ask Mr. Hackett to read it to you? A. No, sir.

"Q. What was it you say—you didn't ask for anybody to leave you a copy of this release, did you? A. No, sir.

"Q. But you did get the $450? A. Yes, sir.

"Q. That is what you had wanted? A. That is what I wanted."

Plaintiff, his wife and his three daughters could all read and write and were all present at the time the settlement was discussed and the release signed.

The written release which plaintiff admits he signed and acknowledged completely extinguishes his alleged cause of action. He seeks to avoid the consequences of the release by pleading that the agents and representatives of defendant induced him to sign it by telling him that he had no claim or cause of action against the defendant and under the laws of Missouri could not recover damages from the defendant; that he had no valid claim against the defendant for his wages during his disability, but that defendant was willing to and would pay him his wages while he was recovering from his injuries. He also pleads that he did not know the contents of the release at the time he signed it, but supposed it was a receipt for his wages.

We will take first the claim of plaintiff that he did not know the contents of the release at the time he signed it.

The rule of law governing this contention is so well stated by SANBORNE, J., in Chicago, St. P., M. & O. Railway Co. v. Belliwith, 83 F. 437, 439, and quoted with approval by the Supreme Court of this State in Woosley v. Wells, 281 S. W. 659, 701, that we reproduce it here. It is as follows:

"A written contract of release cannot be annulled or avoided by proof that one of the parties to it, who was sound in mind and able in body, could not read or write, did not know the terms of the agreement, and neglected to ask any one to read it to him when he

signed it. A written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may, and probably will, pay his money and shape his action in reliance upon the agreement. . . . If one can read his contract, his failure to do so is such gross negligence that it will estop him from denying it, unless he has been dissuaded from reading it by some trick or artifice practiced by the opposite party. If he cannot read it, it is as much his duty to procure some reliable person to read and explain it to him, before he signs it, as it would be to read it before he signed it if he were able to do so; and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents.

This well-recognized rule of law is followed in the following cases: Hall v. K. C. Southern Railway Co., 209 S. W. 582; Bank v. Hall, 129 Mo. App. 292, 108 S. W. 634; Byrssen v. Union Electric Light and Power Co., 295 S. W. 116; Austin v. Brooklyn Cooperage Co., 285 S. W. 1015; Hughey v. Truitt, 196 S. W. 1065; Crim v. Crim, 162 Mo. 522.

Plaintiff's own evidence is that he signed the release three months after his injury. After he returned home from the hospital, he sent his wife to defendant's office to inquire what defendant intended to do about making a settlement with him. In response to this inquiry, Barry and Moore, representatives of defendant, went to his home and talked with him about a settlement. Plaintiff's wife and his three daughters were present at this conversation. Barry told him that under the law, he had no claim against defendant for either damages or wages. Barry offered to pay him $450 and told him that that amount was all he could pay him. He also told him that if he wished to think the matter over, he and Moore would return later. Moore and Barry left the house and during their absence plaintiff talked the proposed settlement over with his family and decided to accept the $450 offered him. When Moore and Barry returned, plaintiff told them that he had decided to accept the $450 and at that time signed the release which Barry presented to him. Although plaintiff was able to read he signed the release without reading it and without asking any member or his family or anyone else present to read it to him or explain to him its contents or tell him what it was.

There is no basis for a claim that plaintiff was prevented from reading the release or having it read and explained to him before he signed it. Plaintiff testified that he could not read without glasses and that he had no opportunity to read the release after

his wife gave him his glasses. This statement, however, is not persuasive in the total absence of any showing that he was induced to sign the contract without reading it, or was prevented from reading it by any act of the defendant, after he got his glasses.

Under the authorities above cited, plaintiff's failure to read the release before he signed it or have someone present to read it or explain it to him, amounted to gross negligence which precludes him from now claiming that he did not know the contents of the release at the time he signed it and prevents him from avoiding it on that ground.

Plaintiff cannot avoid the consequences of the release on account of his mental or physical condition at the time he signed it. In order to avoid the release on this ground it would be incumbent upon plaintiff to show that his mental condition was such that he would not have been able to comprehend the nature and purpose of the release if he had read it or if it had been read to him by another. [Anderson v. Drug Co., 149 Mo. App. 544.] No such showing was made in this case. While plaintiff had not fully recovered from his physical injuries and was still suffering some pain, he was able to and was sitting up in a chair on the day he signed the release. He arranged for the conference with defendant about the settlement of his claim, talked intelligently to Barry and members of his family about the settlement, signed the release, saw his wife sign it as a witness, knew the capacity in which she signed it, and compared the draft with the release to see that it was for the proper amount. In fact, there is no evidence in the record tending to show that he was mentally incapacitated at the time.

We next take the claim of plaintiff that he was induced to accept the $450 and sign the release by the representations of defendant's attorney. He testified that this attorney told him that he could only give him his wages; that his wages were all he could get and he was lucky to get that; that any good lawyer would tell him the same thing; that under the laws of Missouri he could not get anything.

The most that can be said of these statements is that they were mere expressions of a legal opinion and, therefore, not actionable. [Dalrymple v. Craig, 149 Mo. 345, 354.] The rule is that fraud cannot be predicated on misrepresentations as to matters of law, because everyone is presumed to know the law. [26 C. J. 1207; 12 R. C. L. 295; Easton-Taylor Trust Co. v. Loker, 205 S. W. 87; Champion Funding Co. v. Heskett, 125 Mo. App. 516, 102 S. W. 1050; Ordway v. Continental Insurance Co., 35 Mo. App. 426.]

The general rule that misrepresentations as to a matter of law dd not constitute actionable fraud, is subject to two well-recognized exceptions, (1) where there is a relation of trust and confidence between the parties (12 R. C. L. 296), and (2) where one party is

possessed of superior knowledge and takes advantage of the other party's ignorance of the law to mislead him by studied concealment or by misrepresentation. [26 C. J. 1209.]

There is no contentin in this case that there was any relation of trust or confidence between the parties, therefore the validity of the release must be determined in the light of the second exception to the general rule.

The statements made by defendant's attorney to plaintiff, did not relate to any material fact in the case, but, at most, were mere expressions of his opinion as to defendant's liability to plaintiff for the injuries received by him while in defendant's employ.

There was nothing in the conduct of defendant's attorney or in the statements made by him at and prior to the execution of the release indicating any fraud, imposition, misrepresentation or undue influence on his part. He simply expressed his opinion that plaintiff could not recover anything from defendant on account of his injuries. Neither is there anything in the evidence to indicate that plaintiff was mentally incapacitated in any way. Under such circumstances he had no right to rely on the mere opinion of his adversary's attorney. The rule of law applicable to such a state of facts is declared by the Supreme Court of this State in Dailey v. Jessup, 72 Mo. 144, 145, 146, as follows:

"It is unnecessary to cite authorities in support of the proposition that mere ignorance of the law on the part of a party to a contract will not authorize a court of equity to set aside the contract. There must be something more. The circumstances attending the making of the contract must be such as to excite "suspicions of fraud, imposition, misrepresentation or undue influence on one side, and imbecility, credulity or blind confidence on the other. [Faust's Admr. v. Birner, 30 Mo. 414; Griffith v. Townley, 69 Mo. 13.] In the present case it appears from the testimony that the defendant was himself of opinion that he was not liable for interest after the tender, but that the plaintiff's attorney insisted that he was, and prevailed upon him to execute his note for a sum which included the interest. What the considerations were which induced him to accede to the demands of the plaintiff's attorney nowhere appear. The defendant was fully aware of all the facts, and intentionally bound himself to pay interest which he thought he was not legally liable to pay; and in the absence of testimony tending to create even a suspicion of fraud, imposition, misrepresentation or undue influence, he must be held bound by his contract. The plaintiff's attorney doubtless honestly entertained the opinion that the defendant was liable for interest; at all events, the defendant was under no obligation to rely upon his opinion."

A similar question was before this court in Ordway v. Continental Insurance Co., 35 Mo. App. 426, 434. In disposing of the contention there made this court said:

"The misrepresentations complained of must relate to some material fact, about which the truth was not known to the complaining party, and must not relate to some question of law on which an opinion is given by one on whom the complainant had no right to trust. Courts will not relieve on account of a mere opinion or judgment as to these matters, except in peculiar cases of trust and confidence. [Starr v. Bennett, 5 Hill 305; Lehman v. Shackleford, 50 Ala. 439; Reed v. Sidener, 32 Ind. 375; Story, Eq., sec. 197, supra.] . . . and in the words of the court in Starr v. Bennett, supra, 'if the plaintiff wanted an opinion on the law he should have gone to a person learned in the law (one in whom we would put trust and confidence) and not to his adversary.' "

In the case at bar there is no evidence of fraudulent representation. The gist of the representations relied on to avoid the release are that Barry, defendant's attorney, told plaintiff he could not recover anything from defendant, but defendant would pay him $450 as wages for the three months he had been disabled and that was all he could get. He did not insist that plaintiff accept the $450 and sign the release, or attempt to persuade him to do so, but on the contrary told him to think the matter over and he would return later. Barry and Moore went away, and during their absence, plaintiff discussed the proposed settlement with members of his family and when Barry and Moore returned, he told them that he had decided to accept the $450.

These facts do not show actionable fraud. The general rule is that mere expressions of a legal opinion made to a party by his adversary's attorney, do not constitute actionable fraud and cannot be relied upon to avoid a contract claimed to have been induced by such opinion, unless other facts in connection with the opinion given, bring the case within the exception to the general rule. No such showing was made in this case. We, therefore, hold that the release executed by plaintiff is valid and binding on him, and for this reason, defendant's demurrer to the evidence should have been sustained.

We have examined and carefully considered the authorities cited by plaintiff in support of a contrary insistence, but find that they do not support his contention.

Our conclusion that the settlement made between the parties and the release executed by plaintiff in consummation of such settlement, are valid and binding, renders the discussion of other points unnecessary.

The judgment of the trial court should be and is hereby reversed. *Williams, C.,* concurs.

PER CURIAM:—The foregoing opinion by FRANK, C., is hereby adopted as the opinion of the court. All concur, except *Trimble*, P. J., absent.