MARGARET THOMPSON, ADMX., RESPONDENT, v. KANSAS CITY, CLAY COUNTY & ST. JOSEPH RAILROAD COMPANY, APPELLANT.

Kansas City Court of Appeals.   February 17, 1930.

*W. D. Bush* and *Cowgill & Popham* for respondent.

*Cooper & Neel* and *Ingraham D. Hook* for appellant.

BARNETT, C.—This is a suit for wrongful death. It was brought by the plaintiff as administratrix of the estate of her deceased adult

son, Merritt B. Thompson. The petition merely alleges that the plaintiff is the administratrix of the estate of deceased, having been duly and legally appointed as such administratrix according to law, and duly and legally qualified as such. The evidence shows that the plaintiff was appointed as administratrix by the Probate Court of Jackson county and that she made a settlement of her cause of action and signed a release in which it is recited that as administratrix of the estate of Merritt B. Thompson, for the sole consideration of $1000 and certain expenses in the sum of $363, she released and discharged the Kansas City, Clay County & St. Joseph Railroad Company and the United States Fidelity & Guaranty Company of and from all claims, demands, damages, actions, or causes of action on account of injuries resulting or to result from an accident to her son, Merritt B. Thompson, which occurred on or about the 4th day of September, 1925, by reason of his death from personal injuries sustained while in the employ of said railroad company.

The evidence most favorable to plaintiff shows that a few days after her son was killed Mr. Campbell, an adjuster for the insurance company that carried defendant's risk, in company with James Pennington, plaintiff's brother and an employee of defendant, called upon the plaintiff. Mr. Campbell made known to the plaintiff that he was the adjuster for the insurance company and broached the subject of a settlement of her cause of action. Plaintiff told him she did not feel like talking settlement and asked to be excused. The two left immediately, but three or four days thereafter Mr. Campbell and the plaintiff's brother again called upon her. The adjuster asked the plaintiff what she was going to do and what her plans were, but there was nothing in that discussion of any importance and no definite offer of settlement was made. Another interview was had at which Mr. Campbell asked the plaintiff if she was ready to settle and she advised him that she would rather have a lawyer take care of the matter; but Mr. Campbell advised her to let lawyers alone; that this was only an overhead expense that would not do her any good at all and she did not need a lawyer. The plaintiff testified that she had several adult relatives with whom she could have advised but that she did not do so, but stated "I used my judgment as near as I knew how with Mr. Campbell's advice." "I was listening to Mr. Campbell and brother Jim's advice and I felt that they were advising me right at that time." The plaintiff testified that Mr. Campbell said that he was an adjuster for the insurance company and she understood perfectly whom he represented and that he was "there for the railroad." She stated that she felt that she was being advised according to her own interests; that Mr. Campbell was a very smooth talker and very kind and nice in every respect and he said: "Mrs. Thompson, I will be frank with you, $900 is all the law allows under any con-

sideration.'' She did not make any inquiry concerning the statutory limit upon recovery for wrongful death.

The negotiations for settlement were pending for some time and there were numerous conferences. The plaintiff stated that she wanted to be better satisfied and wanted to understand more thoroughly, but the adjuster and her brother insisted so hard that she not consult an attorney and told her what could be done and what could not be done that she felt that they knew what they were talking about and ''relied upon their advice to that extent.'' She testified that her brother Jim said: '' 'You had better take what you can get and keep your mouth shut about it,' '' and that was all that he said about a settlement that she could remember. The plaintiff testified that when Mr. Campbell told her that $900 was all the law allowed under any consideration she said she would not consider anything of the kind. Then Mr. Campbell said he would do a little better, that he would pay the funeral expenses, and she agreed to ascertain the amount of the funeral expenses and let him know what she would do at another interview; that she wanted to think over the matter a while longer; that she was in too weak a condition to even consider it much at that time. Later, she testified that it was after Mr. Campbell had offered to pay the funeral expenses that he said that $900 was ''all could be done.'' She testified that she felt like if she was going to get $900 and have to turn it over to a lawyer and Mr. Campbell was kind enough to tell her that $900 was all that she could get ''why go bother.'' At a subsequent interview Mr. Campbell said that since plaintiff had two children to educate he would increase his offer from $900 to $1000. She finally agreed to accept $1000 plus the funeral expenses in settlement of the cause of action.

Before any payment was made she went to the insurance company's office where an application was made to the probate court for permission to settle the case and where the release was drawn. The application was presented to the probate court, an order granting permission to make the settlement was made, the release was signed, and plaintiff was paid the amount mentioned therein. The plaintiff contended that she did not read all of the paper that she signed, but admitted that she understood that she was settling the claim. She admitted that she could read and write but stated that Mr. Campbell hurried her by suggesting that it was growing late and that it was necessary to get down to the courthouse. However, there is no claim that the release contained any provisions different from what the plaintiff understood to be included in the agreement. Plaintiff testified that she asked how her boy was killed, that she wanted to know the circumstances of the affair; that she asked her brother Jim, she asked Mr. Campbell, she asked anyone that was connected with the company that she could find to talk to, and

"they would just turn me down. 'You don't need to know, Mrs. Thompson, it will be no necessity to you, none whatever.' That wasn't satisfying me at all. I wanted to know." At another time she testified: "Everyone that I would speak to, they would turn me down and say they didn't care to talk to me about the matter—'We don't want to talk to you about it. It doesn't concern you and it won't help you at all.'" She testified that she had two relatives working for the defendant company. She asked them to ascertain the manner in which her son met his death; that "they both inquired —went over to the shops and inquired of people, and none of them would talk to them about it at all, but said they would rather not talk."

At the trial Mr. Birt, a witness for plaintiff, testified that the plaintiff's brother, Jim Pennington, placed the trolley pole of a motor car upon the trolley wire without first three times calling out a warning which was required by the company's rules. From this, together with other evidence in the case, the jury was justified in finding that plaintiff's son came to his death while working upon the electrical equipment of one of defendant's cars because the trolley pole on the car had been connected with the current without previous warning. The plaintiff's brother, Jim Pennington, was a witness for the defendant and denied that he placed the trolley upon the wire; but testified that he removed the trolley from the wire when he ascertained, from the shouts and remarks of various employees, that someone had become electrocuted while working upon the electrical equipment in the car.

The testimony disclosed that Mr. Campbell, the adjuster, was admitted to the bar, but plaintiff testified that she did not know that Mr. Campbell was a lawyer. Plaintiff testified that she felt that her case was fairly settled until later on, but that she was better satisfied with Mr. Birt's version of the circumstances under which her son met his death, than she was with the statement of any other person, and that she believed that the defendant's agents knew how her son met his death. There was testimony in the case that it was the duty of a person who intended to work upon the electrical equipment of the car to place two blue flags upon the car so that it might be known that a man inside of the car was exposed to danger if the current was connected. The deceased went to work in the car without placing any flags upon the car. His helper came up after he had gone to work, and placed two flags in the car but did not put them in position. He was then told by Mr. Thompson to go after certain supplies. While he was gone the deceased was electrocuted. The deceased did not tell the helper to bring the flags nor to put them in position. The helper said that he thought Mr. Thompson was working on the light globes and did not see him engaged in any activity which might cause him to be exposed to

danger if the current should be turned into the car. However, he also stated that he should have known enough to put up the flags without being told. He stated at one time that it was his duty to put up the flags and at another time stated that he supposed that it was as much the duty of the deceased as it was his duty to take this precaution.

Mrs. Thompson testified that she asked her brother Jim and Mr. Campbell a number of times how her son met his death, but they said they did not know who put the trolley up, or who killed the boy; that it was a mystery death that no one understood; that no one knew how it happened; that she did not know at the time she made the settlement that her brother was the one who put the trolley on the wire.

After the settlement was made and the payment had been accepted thereunder by the plaintiff, she caused herself to again be appointed as the administratrix of her son's estate by the probate court of Clay county. She tendered back the money she had received, which tender was refused, and then instituted this action. There was a verdict for plaintiff in the sum of $6137. Motion for new trial was filed and overruled and defendant has appealed.

### Opinion.

Appellant contends that the evidence shows that plaintiff's cause of action is barred as a matter of law by settlement and release. The respondent contends that the release was procured by fraud and is therefore void. Respondent's contention is that the general rule that misrepresentations as to matter of law do not constitute actionable fraud is subject to well-recognized exceptions, namely: (1) where there is a relation of trust and confidence between the parties and (2) where one party is possessed of superior knowledge and takes advantage of the other party's ignorance so as to mislead him by studied concealment or by misrepresentations. The two exceptions to the general rule are correctly stated by the respondent. It is only necessary to determine whether or not the evidence most favorable to the plaintiff brings this case within either of the two exceptions. There is not the slightest evidence that any relation of trust and confidence existed between the parties. The relation of the parties was hostile, which fact was well understood by the plaintiff. She knew that she was dealing with an adjuster who acted for the railroad company and for the insurance company that carried the risk. She considered that she had a cause of action, or at least that she had reasonable ground for asserting a cause of action, against the railroad company. She was negotiating with her adversary with a view to collecting money in settlement of her claim. It was not within the apparent scope of the adjuster's authority to look out after the interests of the plaintiff in the transaction.

The general rule as to misrepresentations concerning matter of law has been thus stated:

"It has been said that misrepresentations or concealments as to a matter of law cannot constitute remediable fraud because everyone is presumed to know the law and therefore cannot in legal contemplation be deceived by erroneous statements of the law, and such representations are ordinarily regarded as mere expressions of opinion on which the hearer has no right to rely. Furthermore it has been held that a charge of fraud cannot be predicated on an honest error in statement of the law." [26 C. J. 1207.]

To the same effect see Security Savings 'Bank v. Kellems, 9 S. W. (2d) 967; Allgood v. Tarkio Electric & Water Co., 6 S. W. (2d) 51; Gilmore v. Ozark Mutual Ass'n, 21 S. W. (2d) 633. However, an exception to this rule is recognized if the statement is made by one learned in the law:

"Redress may likewise be had if one party possessed superior knowledge and took advantage of the other party's ignorance of the law to mislead him by studied concealment or by misrepresentation." [26 C. J. 1209; Security Savings Bank v. Kellems, supra.]

In the case before us the adjuster was a lawyer; but we attach no importance to that fact, because the plaintiff did not know he was a lawyer and therefore could not have relied upon his superior knowledge. Furthermore, she did not rely upon this statement that $900 was all that the law allowed. She testified that she was not satisfied and refused to settle and did not settle upon the basis that that was the most that could be recovered. We think that the defendant had a right to deny liability. [Gilmore v. Ozark Mutual Ass'n, supra.] Since there was no relation of trust or confidence between the parties, we think it was not the duty of the defendant to tell the plaintiff how the accident happened, even if it knew.

"A party to a lawsuit is not bound to disclose to his adversary facts which tend to defeat or weaken his own right of recovery and he commits no fraud by remaining silent. So, too, one who is trying to settle litigation, has the right to keep his opinion upon the merits to himself, and is not guilty of fraud in so doing, for in such case the parties are dealing with each other at arms length and are adversaries." [12 R. C. L. 319.]

In the case of Allgood v. Tarkio Electric & Water Co., supra, this court held that a statement of an attorney that an employee could only recover wages for his injury when the employee signed a release of his cause of action constituted a mere expression of his legal opinion and was not fraudulent. In the case of Security Savings Bank v. Kellems, supra, the Supreme Court held that a statement by a lawyer that if a woman signed certain notes secured by a deed of trust upon some of her property that no one could take her homestead was fraudulent. In that case the plaintiff's husband

owed a debt to a bank. The attorney for the bank prevailed upon the plaintiff's wife to execute a deed of trust to secure her husband's indebtedness. The attorney made the false statement that it would be necessary for her to sign the notes secured by the deed of trust in order to give validity to the mortgage. The plaintiff was willing to give the deed of trust, but insisted that she did not want to sign anything which would affect her homestead. The attorney called her attention to the fact that the deed of trust was not upon her homestead and then said:

"They can't touch your home with these notes, all the lawyers between you and hell can't touch your home. Them notes is just to make this deed a trust deed, without them the deed of trust is no good."

The attorney also told the wife that she would not be liable except to the extent of her interest in the lots described in the deed of trust. The Supreme Court stated that the general rule was that an action for fraud cannot be based upon misrepresentations of law unless there is a relation of trust and confidence between the parties, but that the case before them came within the exception which permits fraud to be predicated on a misrepresentation of law by a party having superior knowledge.

We think that the Allgood case decided by this court and the Security Savings Bank case decided by the Supreme Court are in harmony. In one case a lawyer purported to correctly state a settled principle of law concerning which there could be no two opinions among lawyers. He represented himself to be learned in the law and undertook to advise one who was ignorant thereof. A representation that a defendant is not liable in a particular lawsuit or can only be held liable for a small amount is not a misstatement of a settled principle of law. Whether or not the defendant is liable depends upon what the witnesses will swear to. If the plaintiff's brother was to be believed, then the inference was very strong that the deceased himself caused the current to be turned into the car upon which he was working. The question as to whether the deceased was guilty of contributory negligence because he did not put out blue flags as required by the rule of the defendant company was very close. The only thing which resembled a misrepresentation of a settled principle of law was the statement that $900 was the most that plaintiff could recover. The charge of fraud cannot be predicated upon that statement for the reasons we have mentioned, namely; the plaintiff did not rely upon the fact that the adjuster was a lawyer, because she did not know it and she did not rely upon the truthfulness of the statement because she rejected a settlement based upon any such limitation and insisted upon a settlement for a sum substantially in excess thereof. We are of the opinion that the settlement was a complete bar to this action.

422

The fact that plaintiff was first appointed administratrix by the probate court of the wrong county and thereafter reappointed by the court of the proper county without any vacation of the first appointment does not affect the result. The first appointment was valid and the jurisdiction of the probate court of Jackson county was exclusive until the appointment was vacated. [Baker v. Smith's Estate, 18 S. W. (2d) 147, l. c. 152; In re Estate of Davison, 100 Mo. App. 263; Johnson v. Beazley, 65 Mo. 250.]

The judgment should be reversed. The commissioner so recommends. *Boyer, C.,* concurs.

PER CURIAM:—The foregoing opinion by BARNETT, C., is adopted by the court. The judgment is reversed. *Bland* and *Arnold, JJ.,* concur; *Trimble, P. J.,* absent.